1   Dennis L. Porter (Cal. Bar #67176)
    Attorney at Law
2   8120 36th Avenue
    Sacramento, California 95824-2304
3   Telephone: (916) 381-8300
    Fax: (916) 381-8726
4   dlporter2@yahoo.com

5   Caroline Lobdell, Ore. Bar #021236, *pro hac vice pending*
6   Shay S. Scott, Ore. Bar #934214*, pro hac vice pending*
    Scott W. Horngren, Ore. Bar #880604, *pro hac vice pending*
7   WESTERN RESOURCES LEGAL CENTER
    9220 SW Barbur Blvd., Suite 327
8   Portland, Oregon 97219
    Telephone: (503) 768-8500
9   Fax: (503) 222-3255
    clobdell@wrlegal.org
10  sscott@wrlegal.org
    shorngren@wrlegal.org
11
12  Attorneys for Plaintiffs

13

14

15                    **UNITED STATES DISTRICT COURT**

                **FOR THE EASTERN DISTRICT OF CALIFORNIA**
16
                          **SACRAMENTO DIVISION**
17
    **DEVILS' GARDEN PRESERVATION**          )
18  **GROUP**, an unincorporated association;  )   Case No:
    **WILSON RANCHES,** a California general   )
19  partnership; and **GREEN VALLEY CORP.**,  )   **COMPLAINT FOR DECLARATORY**
    a California corporation dba MS Ranch,     )   **AND INJUNCTIVE RELIEF**
20                                             )
                                               )
21                     Plaintiffs,             )
              vs.                              )
22                                             )
                                               )
23  **AMANDA McADAMS,** in her official        )
    capacity as Forest Supervisor, Modoc       )
24  National Forest; and **U.S. FOREST**       )
    **SERVICE**, an agency within the U.S.     )
25  Department of Agriculture,                 )
                                               )
26                     Defendants              )
    _____

27

28

    COMPLAINT - 1

## INTRODUCTION

1.      This case arises out of defendants' failure to protect the ecological balance on the Modoc National Forest by failing to remove excess wild horses pursuant to the Wild Free-Roaming Horses and Burros Act of 1971 ("WHA").  Failure to follow the law has led to significant overpopulation of wild horses resulting in damage to ecological values and impairment of multiple uses.  Defendant United States Forest Service ("USFS" or Forest Service") is an agency within the United States Department of Agriculture.  Defendant Amanda McAdams is the Forest Supervisor for the Modoc National Forest.  Defendants have already determined that a significant overpopulation of wild horses exists within the Devils' Garden Plateau Wild Horse Territory ("DGWHT"), and that removing "excess animals" within the meaning of the WHA is needed to restore and maintain a thriving ecological balance and meet multiple-use objectives.  However, defendants have failed to comply with their removal obligations arising from an excessive wild horse population.  Instead, they have decided to entirely eliminate livestock grazing from the two grazing allotments with the largest concentration of wild horses.

2.      Following the 2016 foaling season, an estimated 2,800 wild horses overpopulate the Modoc National Forest – substantially above the upper limit of the Appropriate Management Level ("AML") of 402 wild horses.  The excess animals are severely damaging the rangeland resources.  Plaintiffs are an association of landowners and individual landowners with federal grazing permits on allotments within the DGWHT.  The overpopulation is causing damage to plaintiffs' livestock operations, livelihoods, and way of life.   Plaintiffs have filed this action for a declaration that defendants are arbitrary and capricious for failing to follow the DGWHT plan as required by the National Forest Management Act, §§ 1600-1687 ("NFMA") and for deciding to eliminate grazing from plaintiffs' grazing allotments.  Plaintiffs also seek to compel agency

action to remove excess animals from the Modoc National Forest and restore ecological balance and support multiple use as required by the WHA.

## JURISDICTION AND VENUE

3.      This court has jurisdiction pursuant to 5 U.S.C. § 702 (judicial review of federal agency action and failure to act under the Administrative Procedure Act) and 28 U.S.C. § 1331 (federal question jurisdiction).  Jurisdiction is also proper under 22 U.S.C. § 2201, because plaintiffs seek to declare their rights and legal relations.  Defendants have waived sovereign immunity pursuant to 5 U.S.C.  § 702.  An actual, justiciable controversy exists between plaintiffs and defendants.  The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.

4.      Venue is proper in this court pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1). Defendants are an employee and agency of the United States government.  Defendant McAdams resides in this judicial district, the acts and omissions giving rise to the claims occurred in this judicial district, and the property that is the subject of this action is situated in this district.

## PARTIES

5.      Plaintiff Devil's Garden Preservation Group ("DGPG") was founded to promote its members' interests in the protection and preservation of the Devil's Garden Plateau on the Modoc National Forest ("Modoc NF").  DGPG is an association of ranchers and others who live in and around the Devil's Garden Plateau ("Plateau") and derive both a living and a cultural identity from the area.  DGPG's members enjoy the natural beauty of the Plateau, appreciate the abundant plant and animal life, enjoy viewing wild horses in numbers compatible with healthy management of the range resource, and have an interest in ensuring their continued enjoyment and economic ability to live and work in the area.  DGPG's members live near and work within

the Devils' Garden Plateau Wild Horse Territory, and their ranching and ability to graze on their allotments within the DGWHT are harmed by the overpopulation of wild horses. Defendants' failure to control excess animals within the DGWHT causes the loss or diminution of vegetation, decreases water quantity and quality, and increases the risk of wildfire on the Modoc NF and adjacent private lands.

6.      Plaintiff Wilson Ranches is a family-owned cattle ranch located in the Plateau area and headquartered in Alturas, California. Wilson Ranches is a general partnership owned by Bill and Carolyn Wilson. The ranch has been in operation in California for nine generations. Fifteen years ago, Wilson Ranches purchased a grazing permit in the Pine Springs Allotment for $150,000. The permit was to secure additional forage for Wilson Ranches' herd. About 90% of the Pine Springs Allotments is within the DGWHT. Pine Springs Allotment was a 600-head permit at the time of purchase. Monitoring by defendants has revealed that the population of wild horses on the allotment is estimated to be 750% above the current upper limit of the AML. An estimated 261 wild horses forage in the allotment above the AML of 35, with the highest concentration and heaviest use in the northern $3/4^{th}$ of the allotment. Wilson Ranches has been adversely affected by defendants' failure to follow the TMP and failure to act to remove horses to achieve the AML. Wilson Ranches has consistently participated in grazing and wild horse management issues with the Modoc NF.

7.      Wilson Ranches advised defendants in October 2010 about problems associated with excessive horses within the territory, their negative impacts on the range, and the Modoc NF's arbitrary decision to reduce livestock numbers. Wilson Ranches commented on the draft Environmental Assessment for the Territory Management Plan ("TMP") in June 2013, pointing out that wild horses greatly exceeded the AML. In January 2014 Wilson Ranches further objected to the limit on cattle that could turn out on Modoc NF allotments due to excess wild

horses.  At present, defendants have reduced the numbers of livestock Wilson Ranches is permitted to graze on the allotment from approximately 600 head to only 300, one-half of its original amount.  When defendants force Wilson Ranches to remove livestock, the livestock must be fed elsewhere or sold prematurely, causing significant economic loaa.

8.      Since 2014 the Forest Service has cut Wilson Ranches' cattle allotment numbers in half due to wild horse overpopulation.  Wilson Ranches was recently notified of the decision that next year in 2018, the Forest Service will shut down its allotment because of wild horses, preventing Wilson Ranches from utilizing the allotment at all.  The Forest Service decided to reduce Wilson Ranches' Pine Springs Allotment cattle numbers to zero.

9.      Plaintiff MS Ranch is a livestock ranch headquartered in Alturas, California.  MS Ranch was bought by Green Valley Corporation in 2005 from the original owner, Robert Schulter.  Green Valley Corporation continues to operate the ranch under the dba MS Ranch.  The acquisition included the grazing permit for the Emigrant Springs Allotment.  Approximately 95% of the allotment, including 7,632 acres of Bureau of Land Management ("BLM") administered land, is within the DGWHT.  MS ranch is managed by Mr. Jess Dancer.  In 2013, the Modoc NF established an AML range of between 24 to 61 wild horses for the allotment, but monitoring showed an overpopulation of 223 wild horses.  The grazing permit for the Emigrant Springs Allotment at the time it was acquired allowed grazing of 330 head of livestock on Forest Service managed lands and 49 head of livestock on BLM lands, for a total of 379 head of livestock.  Livestock are rotated to MS Ranch's meadows in the fall where they are fed on hay from fields that were irrigated and hayed during the summer.

10.      MS Ranch has long participated in grazing and wild horse management issues with the Modoc NF.  MS Ranch has objected as recently as 2016 regarding defendants' decisions to reduce livestock numbers on the Emigrant Springs Allotment due to excess wild horses and range

degradation caused by horses.  MS Ranch has attended Modoc NF planning meetings, as well as meetings to address the ongoing problem of wild horse overpopulation at the federal, state, and local level.

11.     The Modoc NF has reduced the number of livestock MS Ranch is permitted to graze on its allotment over the past several years due to wild horse overpopulation.  In February 2016, a Modoc NF survey of the Emigrant Springs Allotment showed a minimum of 511 horses, which is more than 800% higher than the AML upper limit of 61.  The Pine Springs area just to the north of Emigrant Springs has a maximum AML of 72 horses, but the February 2016 count showed 370 horses in the area, which is 600% above the AML.  As a result, in 2016 the Modoc NF reduced MS Ranch's permitted livestock on the Emigrant Springs allotment by 43 percent.  A portion of the Emigrant Springs Allotment is on BLM land, which suffered comparable reductions.

12.     MS Ranch has also suffered damages to the range and structural improvements within its allotment.  Wild horse overpopulation has degraded water sources, reduced forage, and caused growth of noxious and non-noxious weeds and thistles (including toxic plants), which displace the normal forage, degrades riparian areas, and displaces native and endangered species. During 2012 and 2013, wild horse overpopulation also destroyed fences and other improvements MS Ranch is required to replace.  During 2014, disturbances within a fenced-in riparian area in the Emigrant Springs Allotment remained a large problem due to wild horse activity.   Instead of jumping the fence as the horses had done previously, in the process of breaching the fences protecting the riparian area, the horses plowed through them and dragged away a quarter mile of fence.

13.     MS Ranch was also recently notified that next year in 2018, the Forest Service will shut down its allotment because of wild horse overpopulations, preventing MS Ranch from

utilizing the allotment at all.  The Forest Service has decided to reduce MS Ranch's cattle numbers for the Emigrant Springs Allotment to zero.

14.     Defendant Amanda McAdams is the Forest Supervisor for the Modoc National Forest.  Ms. McAdams is sued in her official capacity.  Ms. McAdams is responsible to ensure that the national forest she supervises complies with all applicable laws.

15.     Defendant United States Forest Service is an agency within the United States Department of Agriculture.  The Forest Service is responsible for ensuring that wild horse management occurring on the Modoc Forest Service is consistent with all applicable laws.

## FACTS AND LEGAL AUTHORITIES

16.     Plaintiffs run livestock operations in Northeast California.  Their operations involve private property and depend on additional federal rangeland allotments on the Modoc NF to raise the cattle over the year.  Plaintiffs' private grazing lands, federal allotments, and livestock operations are being severely degraded by the Forest Service's failure to perform its duties regarding the management of wild horses, specifically its duty to remove excess animals.

17.     The WHA requires the Forest Service and BLM to manage horses on public lands in a manner designed to achieve and maintain a thriving natural ecological balance.  16 U.S.C. § 1333(a).   Under the WHA, "wild free-roaming horses" on land administrated by the Forest Service are under the Secretary of Agriculture's jurisdiction for the purpose of management. 16 U.S.C. §§ 1332(a), 1333(a).

18.     The Forest Service is required to establish wild horse territories, and designate areas within the territories as specific wild horse range to meet the purposes of the WHA and the Multiple Use Sustained-Yield Act of 1960.  36 C.F.R. § 222.61(a)(3).

19.     The Secretary and Forest Service have duties under the WHA to maintain a current inventory of wild free-roaming horses in areas on public lands and to remove excess animals.  16

COMPLAINT - 7

U.S.C. § 1333(b)(1), (b)(2).  The Secretary and Forest Service shall determine whether and where an overpopulation of excess animals exist, what methods and means to use for removing excess animals, and keep the population of wild horses within appropriate management levels.  *Id.*

20.  Congress reaffirmed its policy of removal of horses from the range in the Public Rangelands Improvement Act of 1978 ("PRIA"), Pub. L. 95-514 (amending the WHA and other rangeland management statutes applicable to Forest Service and Bureau of Land Management rangelands).  In particular, Congress declared removal to be its policy where wild horses "pose a threat to themselves and their habitat and to other rangeland values."  43 U.S.C. § 1901(b)(4). Instances where wild horse overpopulation requires removal include where horses "exceed the carrying capacity of the range," or threaten rangeland values including "fish, wildlife, recreation, water and soil conservation, [and] domestic livestock grazing." *Id.* § 1901(a)(6).

21.  Under the WHA, if the Secretary determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he *shall immediately* remove excess animals from the range so as to achieve appropriate management levels.  Such action shall be taken . . . until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation."  16 U.S.C. § 1333(b)(2) (emphasis added); 36 C.F.R. §§ 222.61(a)(5)-(6) (The USFS shall "determine whether and where excess animals exists," "determine appropriate management levels, whether action should be taken to remove excess animals and what actions are appropriate to achieve the removal . . . .").

22.  Management of wild horses must accord with multiple-use objectives, including "regulating their population and accompanying need for forage and habitat in correlation with uses recognized under the Multiple-Use Sustained Yield Act of 1960."  36 C.F.R. § 222.61(a)(1).

Other resource uses within the DGWHT include timber harvest, livestock grazing, wood cutting, hunting, fishing, camping, and day use.

23.     The DGWHT is located beginning just north of Alturas, California.  The area consists of about 258,000 acres of federally administered public land and is located entirely within Modoc County.  The DGWHT is administered by the Devil's Garden and Doublehead Ranger Districts.  Three percent of the DGWHT, or 7,632 acres, include public lands administered by BLM.  The area is relatively flat.

24.     The Modoc NF and BLM manage wild horses within the DGWHT under a Memorandum of Understanding ("MOU").  The MOU designates the Modoc NF as the lead agency for administration of the wild horse program in the territory, including BLM public lands within the territory.

25.     The 1991 Modoc National Forest Land and Resource Management Plan ("Modoc Forest Plan") established an AML of 275-335 wild horses and set the following range standard: "Manage the wild free-roaming horse herds to achieve a Forest population between 275 and 335 (on the average, 305 animals)." (page 4-19).  The Modoc Forest Plan also includes range standards to "[m]aintain or enhance satisfactory ecological condition" and, "[t]hrough allotment management planning, manage rangeland vegetation to provide for healthy ecosystems; and to make forage available for livestock, wild horse herds, and wildlife species." (page 4-18).

26.     Since the Modoc Forest Plan was approved in 1991, wild horses have been gathered sporadically in an attempt to manage population size, but those efforts have been insufficient to bring populations within AML.  Since approving the Modoc Forest Plan in 1991, defendants have never achieved the AML on the Modoc NF, nor taken sufficient action to do so. These failures violate the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1333(b), and the National Forest Management Act, 16 U.S.C. §1604(i).

27.     In accordance with Forest Service policy and procedures, the AML is set as a population range with an upper and lower limit.  16 U.S.C. § 1333(b); 36 C.F.R. §§ 222.61(a)(5); Forest Service Manual (FSM) 2261.1 and Memorandum of Understanding on Wild Free-Roaming Horses and Burros (FSM 1531.11a) (requiring USFS to coordinate management activities for wild horse populations with the BLM to reflect similar management objectives); *see also* BLM, Wild Horses and Burros Management Handbook, 4710-1 (2010) ("BLM Handbook"). The upper limit is, by definition, the maximum number of wild horses which results in a thriving natural ecological balance and maintains or improves conditions of the range.  16 U.S.C. § 1333(a); BLM Handbook, H-4700-1 at 67; TMP at 4, 7.  The AML lower limit is a number that allows the population to grow to the upper limit over an extended period of time (four or more years), without interim gathers to remove excess wild horses.  *Id.*

28.     Habitat for wild horses is composed of forage, water, cover, and space.  To prevent range damage or adverse impacts to animal health, "the upper limit of AML should be established in consideration of the most limiting forage (or water) production years."  BLM Handbook, H-4700-1 at 68.  The limits are set at a level to establish and maintain an AML that will lead to the management of wild horses in a thriving natural ecological balance in relationship to desired multiple-use objectives over the long-term.  *Id.; see also* 36 C.F.R. §§ 222.61(a)(1), (3).

29.     Wild horse overpopulation within the DGWHT has become an extraordinary problem.  Significant negative impacts on ecosystem health have resulted due to wild horse overpopulation both inside and outside the DGWHT:  degraded riparian areas; loss of one or more endemic plant species on many upland ranges; and conversion to annual grasses and invasive plants on many upper range sites.

30.     For example, when perennial forage grasses are overutilized by wild horses, invasive annual grasses like wiregrass, medusahead, cheatgrass, and foxtail begin to outcompete

COMPLAINT - 10

perennial grasses.  As these invasives become established, the ecological balance is harmed and less forage is available for livestock, wild horses, and wildlife—placing additional pressure on range resources.  The largest extent of cheatgrass and medusahead occurs in the Emigrant Spring and the Pine Springs areas.  Devil's Garden Plateau Wild Horse Territory Evaluation at 4, 24, 40-41 (2013) (noting invasive annual species are dominant on 11,000 acres, or 25% of the Emigrant Spring Allotment, and present in varying amounts on 4,166 acres, or about 9.4%, of the Pine Springs Allotment).  While severe overutilization by livestock can create similar conditions, Forest Service permit terms require permittees to use several methods—such as pasture rotations, resting, and salting to draw livestock to or from certain areas—to achieve strictly monitored utilization rates and prevent those conditions from developing.

31.     These invading annuals, especially wiregrass and medusahead, are destroying the productivity of the rangeland for livestock, wildlife and wild horses.  This permanent conversion is continuing and accelerating as wild horse populations continue to rise.

32.     The wild horse overpopulation damage has become so severe that the University of California Cooperative Extension has been studying and documenting the adverse effects on soil, water, and wildlife.  http://ucanr.edu/blogs/blogcore/postdetail.cfm?postnum=22730

33.     All or a portion of eight grazing allotments managed by the Devil's Garden and Doublehead Ranger Districts are within the DGWHT.  The allotments, acreage within the DGWHT, and land ownership of the allotments are as follows:

| Allotment | Acres | Total Acres | % in DGWHT | Land |
|---|---|---|---|---|
| Carr | 44,180 | 108,437 | 40.7% | USFS |
| East Grizzlie | 712 | 35,055 | 2.0% | USFS |
| Emigrant Springs | 43,793 | 46,131 | 94.9% | USFS & BLM |
| Mowitz | 22,516 | 69,282 | 32.5% | USFS |
| Pine Springs | 40,278 | 44,538 | 90.4% | USFS |
| Potters | 4,812 | 26,311 | 18.3% | USFS |
| Surveyors Valley | 25,754 | 26,403 | 97.5% | USFS |
| Timbered Mountain | 50,475 | 63,092 | 80.0% | USFS |

34.     Through these eight allotments, the Modoc NF has issued grazing permits for 26,880 Animal Unit Months (AUMs) of forage consumption by domestic livestock.  During 2006-2012, however, livestock use authorized under grazing permits has averaged only about 18,548 AUMs of the total permitted.  More recently, authorized livestock use has been reduced to less than 50% of the total of the permitted number on the Pine Springs and Emigrant Springs allotments, which represents about one-third of the entire DGWHT.  Livestock grazing will be completely eliminated in those allotments in 2018 without any resumption in the foreseeable future.  In contrast, under the 1991 Modoc Forest Plan, wild horses were allocated 4,400 AUMs of forage for their use.  TMP at 4.  Under the 2013 TMP, the upper AML of 402 wild horses are allocated 5,789 AUMs.  *Id.* at 6.

35.     "Forage for wild horses (expressed in AUMs) is allocated based on the AML upper limit.  [P]er Forest Service Policy, an adult wild horse has an animal unit factor of 1.2 and 14.4 AUMs of forage is needed to support one adult wild horse for one year."  USFS, Devil's Garden Plateau Wild Horse Territory, Evaluation of Monitoring Data at 1 n.2 (2013).

36.     In January 2013, the Forest Service prepared an AML monitoring document entitled, Devil's Garden Plateau Wild Horse Territory: *Evaluation of Monitoring Data for the Purpose of Determining an Appropriate Management Level*, Pacific Southwest Region Devil's Garden and Doublehead Ranger Districts, Modoc National Forest (Jan. 2013) ("2013 AML Evaluation").

37.     The 2013 AML Evaluation analyzed the AML for wild horses within grazing allotments and determined that existing AMLs needed adjustment based on an analysis of the current available data to address ongoing significant problems with wild horse overpopulation.

38.     The new AMLs proposed in the 2013 AML Evaluation were approved as part of a plan revision to the Devil's Garden Plateau Wild Horse Territory Management Plan (TMP) for

the DGWHT.  The revised TMP was completed in August 2013 and set a new AML range of 206-402 total horses. Revision of the TMP is not an academic exercise.  Forest Service regulations require that the "Forest Service *shall . . .* develop and *implement* a management plan for the wild horse territory."  36 C.F.R. § 222.62(a)(4) (emphases added).

39.     In revising the TMP in August 2013, the Modoc NF adopted new AMLs (Table 1), which includes lower and upper limits for wild horses, specific to each grazing allotment:

| Allotment | Acres | AML lower limit (# horses) | AML upper limit (# horses) |
|---|---|---|---|
| Carr | 44,180 | 32 | 78 |
| Surveyors Valley | 25,754 | 23 | 55 |
| Mowitz | 22,516 | 30 | 30 |
| Potters | 4,812 | 20 | 20 |
| Pine Springs | 40,278 | 29 | 72 |
| Emigrant Springs *(includes BLM land)* | 43,793 | 20 | 61 |
| Timbered Mountain | 50,470 | 48 | 86 |
| East Grizzlie | 712 | 0 | 0 |
| Total for the DGWHT | 232,520 | 206 | 402 |

40.     The new AMLs were "determined through in-depth analysis and evaluation of the current available monitoring data and other information" that assessed the level above which horses would be considered excess and exceed a thriving natural ecological balance to the range. 2013 AML Evaluation at 6.  The AMLs were "completed in compliance with direction provided by Forest Service regulations and policy, the 1991 Forest Plan, procedures found in BLM Handbook H-4700-1 (Wild Horses and Burros Management Handbook), and in compliance with the 1971 [WHA]."  *Id.* at 6-7.

41.     A challenge to the boundaries of the Devil's Garden Wild Horse Territory was recently addressed in *American Wild Horse Preservation Campaign v. Perdue*, No. 15-5332, 2017 WL 3318750 (D.C. Cir. Aug. 4, 2017).  The Court of Appeals held that the Forest Service did not "adequately explain its change in course regarding the size of the Devils Garden Wild

1  Horse Territory and its management of wild horses within the Middle Section." *Id.* at *13.  The

2  2013 Wild Horse Territory Plan did not include the so-called "Middle Section."  The decision

3  in *American Wild Horse* held that the total extent of the DGWHT was about 258,000 acres as

4  stated in the 1991 Forest Plan, rather than a slightly smaller size that excluded an area of 23,631

5  acres under the 2013 TMP.

6

7          42.      In *American Wild Horse*, the court noted that when the Middle Section was

8  included within the wild horse territory under the 1991 Forest Plan, the AML was 275-335 wild

9  horses.  *Id.* at *3.  The AML upper limit under the 2013 wild horse territory plan is 402 wild

10  horses.  Therefore, under either AML, there is an overpopulation of wild horses that far exceeds

11  any plan level and the level that maintains thriving natural ecological balance.

12

13          43.      In adopting new AMLs as part of the 2013 TMP revision, the Forest Service set

14  the following population requirements: (1) manage the wild horse population at the levels shown

15  in Table 1; (2) manage for an overall age distribution as is normally found in a herd over time;

16  and (3) manage to achieve a 50:50 ratio between males and females.  The revised TMP provides

17  that "[a]fter AML is achieved, methods to slow population growth" such as fertility control would

18  be used. TMP Environmental Assessment at 23, 27; TMP at 7, 12.

19          44.      In February 2016, Forest Service personnel completed an aerial survey of the wild

20  horse population in and around the DGWHT.  The results show the wild horse population greatly

21  exceeds the AML of 206-402 adult wild horses.

22

23          45.      The wild horse population reached 2,246 adult horses, which meant the wild horse

24  population had nearly doubled since February 2013 when the last inventory was completed.

25  Following the 2016 foaling season, wild horse population size reached 2,800 animals, which is

26  expected to grow to 3,200 wild horses by early 2018.  According to calculations by Modoc

27

28

COMPLAINT - 14

County Farm Bureau, the population size may reach 18,000 in ten years without gathers to remove excess wild horses.

46.     Currently, wild horses on the Modoc NF are consuming more forage than is allocated in the wild horse territory for livestock, wildlife, and wild horses combined.

47.     As a result of wild horse overpopulation, during 2017, the Modoc NF reduced AUMs on allotments by 35%, with some reduced to 50%.  Next year during the 2018 grazing season, AUMs are planned to be reduced by 45%, and the Wilson Ranches and MS Ranch allotments will be cut to zero AUMs "[d]ue to the excess wild horse numbers."

48.     Defendants have no plans scheduled in the foreseeable future to reduce wild horse numbers to within the AML on the Wilson Ranches and MS Ranch allotments such that livestock grazing can resume on the allotments.  In effect, defendants have abandoned the Modoc Forest Plan, which designates the Emigrant Springs and Pine Springs areas for livestock grazing, by failing to follow the TMP to manage wild horses within the AML.

49.     Upon information and belief, in October 2017, defendants released approximately 60 wild horses gathered from private lands in 2016 back on the Modoc NF, and specifically released wild horses on MS Ranch's Emigrant Springs Allotment, where the Forest Service has arbitrarily decided that livestock grazing can no longer occur in contravention of its own management plans.

50.     Wild horse overpopulation has also created a decline in herd health and major safety issues.  Wild horses are consuming 40% more forage than they are allocated on the entire forest, leaving less nutrition for the overpopulated herd, and less AUMs for permitted livestock within allotments.

51.     Wild horse overpopulation has also created major safety issues.  Wild horses are now crossing over the border into Oregon and wandering off the Modoc NF onto State Highway

139, nine miles south of the Territory, and creating a safety hazard to the public.  Wild horses have also been reported leaving the Modoc NF and wandering into Alturas-area residential developments, creating a further safety hazard to homeowners, children, domestic pets, and the public.

52.     Agriculture is extremely important to the economy of Modoc County.  Cattle ranching and its associated products (hay, pasture, and forage) is the largest segment of agriculture.  According to the 2010 Modoc County Agricultural Commissioner's report, livestock sales were 33.3% of the total $112.1 million in farm cash receipts.  Ranchers within the County rely on public lands grazing for about six months of the year.  Grazing allotments on the Modoc NF are crucial for their operations and livelihoods.

53.     The 2013 AML Evaluation inventoried wild horse overpopulations within the grazing allotments as of 2012 and made the following "excessive animal determinations": (1) Within the Carr Allotment (with a current AML of 32-78 wild horses), the presence of an estimated 116 wild horses year-round.  2013 AML Evaluation at 12; (2) Within the Emigrant Springs Allotment (AML 20-61), a population of about 223 wild horses on the National Forest portion of the allotment.  *Id.* at 6, 24; (3) Within the Pine Springs Allotment (AML 29-72), an estimated 261 wild horses.  *Id.* at 40; (4) Within the Surveyors Valley Allotment (AML 23-55), an estimated 55 wild horses, which fails to provide any margin for the average 25% annual population growth rate.  *Id.* at 55, 59; and (5) Within the Timbered Mountain Allotment (AML 48-86), an estimated 138 wild horses, with extreme concentration within Black Rock Pasture.  As a result, the livestock operator has been unable to use this pasture for years due to excessive use by horses.  *Id.* at 63, 68.

54.     In managing the Modoc NF and DGWHT, defendants have failed to comply with Forest Plan management requirements including those in the TMP, resulting in extraordinary wild horse overpopulation reaching as much as 14 times above the AML limit in certain areas.

55.     Wild horse numbers on the Modoc National Forest will continue to increase every year at staggering rates.  The current wild horse population estimate, which takes into account the 2016 foaling season that occurred since the latest official count, is in excess of 2,800 horses.  That number is nearly 700% of the upper AML limit of 402.  A second foaling season has already occurred in 2017, meaning additional horses are already on the range.  Those additional horses will be included in the official estimate starting in January 2018 and will likely increase the population to 3,200 horses or more.  A population of 3,200 horses would constitute nearly 800% of the upper AML limit of 402.

56.     The forage consumed by 2,800 wild horses permanently on the range every month of the year, equaling about 1.2 AUMs per horse, is 40,320 AUMs.  This is vastly more forage than the 4,400 AUMs allocated to wild horses in the Modoc Forest Plan.

57.     The amount of forage allocated to livestock in the Emigrant Springs and Pine Springs allotments totals 6,500 AUMs.  By eliminating cattle grazing on the Emigrant Springs and Pine Springs allotments, the Forest Service has increased the AUM forage allocation to wild horses contrary to the Modoc Forest Plan and has failed to amend the Forest Plan to reflect the increased forage allocation to wild horses.

58.     The large-scale damage to rangeland resources has significantly harmed plaintiffs' livestock operations and way of life.  Many plaintiffs have maintained their livelihoods via ranching operations for multiple generations.  Due to economic limitations and the fact that the wild horses are federally-protected, plaintiffs can do nothing to prevent damages to their adjacent private lands and the grazing allotments on public rangelands.

59.     Plaintiffs have engaged with the Forest Service and defendants repeatedly and requested that the Forest Service remove the excess animals from the range and from their private properties in order to comply with the TMP and achieve AML.  However, the Forest Services has failed and refused to do so since the TMP was amended in 2013 except for conducting a single gather from private lands.

60.     Plaintiffs Wilson Ranches and MS Ranch have had their livestock numbers and AUMs progressively reduced because of defendants' failure to manage wild horses lawfully pursuant to the TMP as required by the WHA and NFMA.

61.     Defendants' failures to properly follow the law have also harmed wild horses within the DGWHT.  Overpopulation seriously degrades the range resource, and horses are frequently observed in malnourished, unhealthy condition.  Individual wild horses have also been observed as reduced in size due to the lack of nutrition.  Horses have been seen in areas without water or in areas with water sources inadequate to sustain the horses.  Plaintiffs' have a significant interest in the ecological health of the DGWHT, because they want to live and work in a forest that manages wild horses toward achieving a thriving natural ecological balance. Defendants' failure to comply with the WHA and NFMA directly damages the rangelands located within and adjacent to the DGWHT.

62.     On or about July 5, 2017, counsel for plaintiffs met with USFS staff for the Modoc NF and advised that a lawsuit challenging lack of compliance with the TMP was likely.  Upon information and belief, one or more government employees has deliberately destroyed records related to wild horse management strategies to prevent their discovery.  Such instructions and efforts to destroy records was done with knowledge of plaintiffs' claims.  Plaintiffs intend to engage in discovery to learn how any spoliation may have occurred and the extent thereof.

COMPLAINT - 18

Plaintiffs reserve the right to amend the Complaint to assert a claim for spoliation, and/or to file a motion for spoliation sanctions against federal defendants.

## FIRST CLAIM FOR RELIEF

**(Failure to Remove Excess Wild Horses – Violation of Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1333(b))**

**(Administrative Procedure Act, 5 U.S.C. § 706)**

63.     Plaintiffs reallege each and every allegation set forth above.

64.     The Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "[F]inal agency action for which there is no other adequate remedy in a court" is subject to judicial review. 5 U.S.C. § 704. The APA defines "agency action" as "includ[ing] the whole or a part of an agency rule, order . . . or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

65.     The APA provides that the reviewing court "shall (1) compel agency action unlawfully withheld or unreasonably delayed" and "shall (2) hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706.

66.     Under the WHA, the Secretary and Forest Service "shall manage wild free-roaming horses . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

67.     The Forest Service must inventory the number of wild horses and "[t]he purpose of such inventory shall be to:  make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate

COMPLAINT - 19

management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1).

68.    Defendants have a mandatory duty and "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).

69.    "Excess animals" means wild free-roaming horses . . . which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f)(2).

70.    The Modoc NF has determined that excess animals exist on the Carr Allotment, the Emigrant Springs Allotment, the Pine Springs Allotment, the Surveyors Valley Allotment, and the Timbered Mountain Allotment.

71.    The Modoc NF has a legal duty to immediately remove the excess animals from the Carr Allotment, the Emigrant Springs Allotment, the Pine Springs Allotment, the Surveyors Valley Allotment, and the Timbered Mountain Allotment.

72.    Defendants have failed and refused to immediately remove the excess wild horses and have indicated no plans to do so within a period sufficient to halt ongoing ecological harm and impairment of multiple uses.

73.    Defendants' failure and refusal to immediately remove excess wild horses is unlawful and is arbitrary and capricious under the Wild Free-Roaming Horses and Burros Act and the APA. 5 U.S.C. § 706(2)(A) (reviewing court shall hold unlawful agency action that is arbitrary and capricious). Defendants should be compelled to perform their duties under the law. 5 U.S.C. § 706(1) (reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed").

COMPLAINT - 20

**SECOND CLAIM FOR RELIEF**

**(Failure to Remove Excess Wild Horses – Violation of Territory Management Plan under the National Forest Management Act 16 U.S.C. § 1604(i))**

**(Administrative Procedure Act, 5 U.S.C. § 706)**

74.     Plaintiffs reallege each and every allegation set forth above.

75.     The TMP requires the Modoc NF to take specific, necessary action to achieve populations of wild horses within the established AML range in order to protect the range from deterioration associated with overpopulation.

76.     The National Forest Management Act requires that all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of the National Forest System land shall be consistent with the land management plans." 16 U.S.C. § 1604(i).

77.     The TMP is an amendment to the 1991 Modoc Forest Plan (land management plan) and the Forest Service must comply with the terms of the TMP under 16 U.S.C. § 1604(i).

78.     Defendants are not managing and acting consistent with the Forest Plan and TMP by:

   a.     Failing to take necessary action to manage wild horse populations within the established AML range (206-402 adults) to protect the range from deterioration associated with overpopulation.  TMP at 14;

   b.     Failing to schedule gathers to remove excess wild horses when the total population exceeds the AML to the point that grazing of the allotment is significantly curtailed or eliminated.  *Id.*;

   c.     Failing to schedule removals to attain AML by 2016.  *Id.* at 17;

   d.     Failing to conduct annual gathers until AML is achieved, then every 4-5 years thereafter.  *Id.*

e.    Defacto amending the Forest Plan by eliminating livestock grazing on the

Emigrant Springs and Pine Springs Allotments.

f.    Failing to ever act to achieve AML since the 1991 Forest Plan was

adopted.

79.    Instead of following the TMP as required by NFMA, since 2013, defendants only

conducted a small gather limited to private land during 2016.  In the meantime, the wild horse

population within the DGWHT including private and federal land increased from 500% to 800%

above the AML, depending on the allotment.

80.    Defendants' failure and refusal to follow the TMP and maintain wild horses within

AML is unlawful and is arbitrary and capricious.  Defendants must comply with the 1991 Forest

Plan, as amended by the TMP, under 16 U.S.C. § 1604(i), and their actions, inconsistent with

these duties, are unlawful, arbitrary and capricious.  5 U.S.C. § 706(2)(A).  Defendants should be

compelled to perform their duties under the law.  5 U.S.C. § 706(1).  Defendants should also be

compelled to perform their duties under the 1991 Forest Plan, as amended by the TMP, as their

failure to do so is agency action unlawfully withheld or unreasonably delayed.  5 U.S.C. §706(1).

**THIRD CLAIM FOR RELIEF**

**(Elimination of Grazing from the Pine Springs and Emigrant Springs Allotments**

**and Reallocation of Forage to Wild Horses in Violation of the Forest Plan**

**under the National Forest Management Act, 16 U.S.C. §1604(f)(4) and (i))**

**(Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

81.    Plaintiffs reallege each and every allegation set forth above.

82.    The National Forest Management Act requires that all "[r]esource plans and

permits, contracts, and other instruments for the use and occupancy of the National Forest System

land shall be consistent with the land management plans."  16 U.S.C. § 1604(i).

COMPLAINT - 22

83.    The National Forest Management Act also requires that if the Forest Service wants to change the forest plan after final adoption, it must amend the forest plan and provide for public notice.  16 U.S.C. § 1604(f)(4).

84.    The Modoc Forest Plan allocated forage between livestock, wildlife, and wild horses.

85.    The amount of forage allocated to wild horses by the Forest Plan is 4,400 AUMs.

86.    The Forest Plan allocated the area within the boundaries of the Emigrant Springs and Pine Springs allotments to livestock grazing.

87.    The Forest Service has completely eliminated livestock grazing from the Emigrant Springs and Pine Springs grazing allotments with a permitted use of 6,500 AUMs and reallocated the forage used by livestock on those allotments to wild horses for the foreseeable future.

88.    Other grazing allotments on the Modoc National Forest within the DGWHT had their livestock forage use significantly curtailed by the Forest Service because of the overpopulation of wild horses.

89.    The reallocation of forage from livestock to wild horses is not consistent with the Modoc Forest Plan which established a forage allocation for wild horses of 4,400 AUMs. Thus, the reallocation of forage violates 16 U.S.C. § 1604(i).

90.    The reallocation of forage from livestock to wild horses was made without a plan amendment and public notice as required by 16 U.S.C. § 1604(f)(4).

91.    The elimination of grazing from the Emigrant Springs and Pine Springs grazing allotments and reallocation of forage from livestock to wild horses is contrary to the Modoc Forest Plan and without a Forest Plan amendment is arbitrary, capricious, an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A).

**REQUESTS FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment against Defendants and grant the following relief:

1.    For a declaratory judgment that the Forest Service is violating the Wild Free-Roaming Horses and Burros Act of 1971 for failing to immediately remove excess wild horses on the Carr Allotment, Emigrant Springs Allotment, Pine Springs Allotment, Surveyors Valley Allotment, and Timbered Mountain Allotment in violation of the Administrative Procedure Act, and an order compelling defendants to immediately remove excess animals;

2.    For a declaratory judgment that the Forest Service is violating the Territory Management Plan by failing to manage wild horse populations within the established AML range to protect the range from deterioration associated with overpopulation in violation of the National Forest Management Act and the Administrative Procedure Act;

3.    A declaratory judgment that the decision to completely eliminate livestock grazing from the Pine Springs and Emigrant Springs allotments which comprise one-third of the DGWHT, violates the National Forest Management Act and the Administrative Procedure Act;

4.    An order setting aside and vacating the decision to eliminate grazing from the Pine Springs and Emigrant Springs allotments;

5.    For injunctive relief to compel compliance with the requested relief;

6.    An order compelling defendants to comply with the Territory Management Plan and immediately remove excess animals;

7.    For plaintiffs' reasonable costs, litigation expenses, and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8.    For such other relief as the Court deems just or equitable.

COMPLAINT - 24

1        Respectfully submitted this 19th day of October, 2017.

2

3                                        /s/ Dennis L. Porter
                                         Dennis L. Porter (Cal. Bar #67176)
4                                        Attorney at Law
                                         8120 36th Avenue
5                                        Sacramento, California 95824-2304
                                         Telephone: (916) 381-8300
6                                        Fax: (916) 381-8726
                                         dlporter2@yahoo.com
7

8                                        /s/ Caroline Lobdell
                                         Caroline Lobdell (Or. Bar # 021236), *pro hac vice pending*
9                                        Scott Horngren (Or. Bar # 880604), *pro hac vice pending*
                                         Shay Scott (Or. Bar # 934214), *pro hac vice pending*
10                                       WESTERN RESOURCES LEGAL CENTER
                                         9220 SW Barbur Blvd., Suite 327
11                                       Portland, OR 97219
                                         Telephone: (503) 768-8500
12                                       Fax: (503) 222-3255
                                         clobdell@wrlegal.org
13                                       shorngren@wrlegal.org
                                         sscott@wrlegal.org
14

15                                       Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 25