JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

RICKEY D. TURNER, JR.
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Telephone:  (303) 844-1373
Facsimile:  (303) 844-1350

DAVENÉ D. WALKER
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:  (202) 353-9213
Facsimile:  (202) 305-0506

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| DEVILS GARDEN PRESERVATION GROUP, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>AMANDA McADAMS, *et al.*,<br><br>Defendants. | Case No.: 2:17-cv-02185-MCE-KJN<br><br><br>**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' COMBINED OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

  I.   STATUTORY BACKGROUND ......................................................................... 2

    A.   The Wild Free-Roaming Horses and Burros Act ..................................... 2

    B.   The National Forest Management Act ...................................................... 3

    C.   The Administrative Procedure Act ........................................................... 5

  II.   FACTUAL BACKGROUND .............................................................................. 6

    A.   The Forest Service's National Wild Horse and Burro Program ............... 6

      1.   Partnership with the Bureau of Land Management ............................ 7

      2.   Challenges Facing Wild Horse Management and Removal Efforts ... 8

    B.   The Devil's Garden Plateau Wild Horse Territory ................................... 9

      1.   The Devil's Garden Territory Management Plan ............................... 9

      2.   Actions Taken Since 2013 To Address Excess Horses In The Territory ................. 10

ARGUMENT .............................................................................................................. 11

  I.  JUDICIAL MANAGEMENT OF THE FOREST SERVICE'S WILD HORSE PROGRAM
     IS IMPROPER AND ILL-ADVISED. ................................................................ 11

    A.   Unreasonable Delay Is Determined On A Case-By-Case Basis ............. 12

    B.   On Balance, The Forest Service's Actions On The Devil's Garden Territory Have Been
        Reasonable. ............................................................................................. 13

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1. Under the first three *TRAC* factors, the Court considers the reasonableness and consequences of delay in the context of the Wild Horse Act, but these factors are not dispositive ........................................................................ 13

2. *TRAC* factors four and five—the Forest Service's administrative difficulties bearing on its ability to address wild horse populations weigh against a finding of unreasonable delay........................................................................ 13

3. The complexity of a remand to the Forest Service and the Court's lack of expertise in managing wild horses counsels against a finding of unreasonable delay.................. 17

II. PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES FOR THEIR TWO REMAINING NFMA CLAIMS. .................................................. 20

A. Standards For Exhaustion Of Forest Service Administrative Remedies....................... 20

B. Plaintiffs' NFMA Claims Must Be Dismissed Because They Failed To Exhaust Administrative Remedies Prior To Filing Suit ................................................ 21

III. PLAINTIFFS' CLAIMS THAT THE FOREST SERVICE HAS VIOLATED NFMA BY ALLEGEDLY "FAIL[ING] TO ANNUALLY REMOVE EXCESS WILD HORSE POPULATIONS" IS NOT COGNIZABLE PURSUANT TO THE SUPREME COURT'S *SUWA* DECISION ........................................................................ 22

A. The Forest Plan Provision For Wild Horse Management Is A Statement Of Objectives Subject To Forest Service Funding And Priorities ...................................... 23

B. The APA Cannot Be Used To Compel Agency Action Pursuant To The Objectives Of A Federal Land Management Plan.................................................... 24

1. Plaintiffs' NFMA/Territory Management Plan claim in count 2 fails to prove a violation .................................................................................. 26

2. Plaintiffs' NFMA consistency/Plan amendment claim in count 3 also fails to demonstrate a violation of law.............................................................. 27

CONCLUSION.................................................................................. 29

1

# TABLE OF AUTHORITIES

2

3  **<u>CASES</u>**                                                                               **<u>PAGE</u>**

4

5  *Am. Horse Prot. Ass'n v. Watt*,
      694 F.2d 1310 (D.C. Cir. 1982) ............................................................................. 2
6
   *Animals v. U.S. Dep't of Interior*,
7      751 F.3d 1054 (9th Cir. 2014) .................................................................... passim
8
   *Bastek v. Fed. Crop Ins. Corp.*,
9      145 F.3d 90 (2d Cir. 1998)....................................................................................... 21
10
   *Brower v. Evans*,
11     257 F.3d 1058 (9th Cir. 2001) ............................................................................... 13
12
   *Citizens for Better Forestry v. U.S. Dep't of Agric.*,
13     341 F.3d 961 (9th Cir. 2003) ................................................................................. 24
14
   *Cutler v. Hayes*,
15     818 F.2d 879 (D.C. Cir. 1987) .............................................................. 14, 16, 17
16
   *Darby v. Cisneros*,
17     509 U.S. 137 (1993).................................................................................................. 21
18
   *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
19     423 U.S. 326 (1976)................................................................................................... 6
20
   *Forest Guardians v. Forsgren*,
21     478 F.3d 1149 (10th Cir. 2007) ............................................................................ 25
22
   *Friends of the Clearwater v. Dombeck*,
23     222 F.3d 552 (9th Cir. 2000) ........................................................................ 6, 7, 8
24
   *Gleichman v. U.S. Dep't of Agric.*,
25     896 F. Supp. 42 (D. Me. 1995) ............................................................................. 21
26
   *Houseton v. Nimmo*,
27     670 F.2d 1375 (9th Cir. 1982) ................................................................................ 6

28

*In re Am. Fed'n of Gov't Emps.*,
   837 F.2d 503 (D.C. Cir. 1988) ........................................................................ 17

*In re Barr Labs.*,
   930 F.2d 72 (D.C. Cir. 1991) ..................................................................... 16, 17

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000) ....................................................................... 6

*In re Cal. Power Exch. Corp.*,
   245 F.3d 1110 (9th Cir. 2001) .......................................................................... 6

*In re Core Commc'ns*,
   531 F.3d 849 (D.C. Cir. 2008) ........................................................................ 12

*Int'l Chem. Workers Union*,
   958 F.2d 1144 (D.C. Cir. 1992) ........................................................ 6, 14, 17, 18

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................................ 3

*Liberty Fund, Inc. v. Chao*,
   394 F. Supp. 2d 105 (D.D.C. 2005) ............................................................... 17

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .......................................................................................... 6

*Mashpee Wampanoag Tribal Council v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ..................................................... 12, 16, 17

*McBride Cotton & Cattle Corp. v. Veneman*,
   290 F.3d 973 (9th Cir. 2002) ................................................................ 21, 22, 28

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) ........................................................................................ 20

*Native Ecosystems Council v. Weldon*,
   697 F.3d 1043 (9th Cir. 2012) .......................................................................... 4

NFMA.,
   329 F.3d 1089 (9th Cir. 2003) ........................................................................ 28

*Ohio Forestry Ass'n v. Sierra Club*,

 523 U.S. 726 (1998)................................................................................. 4, 24

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,

 465 F.3d 977 (9th Cir. 2006) .................................................................... 5, 28

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,

 2004 WL 1293909 ............................................................................................ 5

*Perkins v. Bergland*,

 608 F.2d 803 (9th Cir. 1979) .................................................................... 4, 29

*Qwest Commc'ns Int'l v. FCC*,

 398 F.3d 1222 (10th Cir. 2005) ................................................................... 18

*Sierra Club v. Hardin*,

 325 F. Supp. 99 (D. Alaska 1971) ................................................................. 4

*Sierra Club v. Thomas*,

 828 F.2d 783 (D.C. Cir. 1987).................................................................. 6, 12

*Strickland v. Morton*,

 519 F.2d 467 (9th Cir. 1975) ......................................................................... 4

*Thomas Jefferson Univ. v. Shalala*,

 512 U.S. 504 (1994).................................................................................... 28

*W. Rangeland Conservation Ass'n v. Zinke*,

 265 F. Supp. 3d 1267 (D. Utah 2017)................................................... 12, 20

*Wyandotte Nation v. Salazar*,

 939 F. Supp. 2d 1137 (D. Kan. 2013)............................................ 17, 18, 19

*Wyoming v. BLM*,

 839 F.3d 938 (10th Cir. 2016) ................................................................ 3, 13

*Telecomms. Research & Action Ctr. v. FCC*,

 (*"TRAC"*), 750 F.2d 70 (D.C. Cir. 1984)............................................ 12, 13, 14

*Wyoming v. U.S. Dep't of Agric.*,

 661 F.3d 1209 (10th Cir. 2011) ..................................................................... 4

**STATUTES**

5 U.S.C. § 706(1) ........................................................................................ 6, 18, 20

7 U.S.C. § 6912(e) .................................................................................................. 21

16 U.S.C. § 531(a) ................................................................................................... 4

16 U.S.C. § 1331 .................................................................................................. 1, 2

16 U.S.C. § 1333(a) ................................................................................................. 2

16 U.S.C. § 1333(b)(1) ......................................................................................... 2, 3

16 U.S.C. § 1333(b)(2) ....................................................................................... 3, 12

16 U.S.C. § 1333(b)(2)(A) ..................................................................................... 14

16 U.S.C. § 1533(b)(3)(A) ..................................................................................... 12

16 U.S.C. § 1600 ................................................................................................. 1, 3

16 U.S.C. § 1604 .......................................................................................... 4, 23, 24

16 U.S.C. § 1604(g) ................................................................................................. 4

16 U.S.C. § 1604(i) ................................................................................................ 24

16 U.S.C. §§ 528-531 .............................................................................................. 3

16 U.S.C. § 1332(c) ................................................................................................. 2

43 U.S.C. § 1732(a) .......................................................................................... 4, 24

43 U.S.C. §§ 1701-1787 .......................................................................................... 4

**FEDERAL REGULATIONS**

36 C.F.R. § 215.14(a)............................................................................................. 21

36 C.F.R. § 222.2 .................................................................................................... 5

36 CFR 251, Subpart C .......................................................................................... 22

43 C.F.R. § 1610.5-3(a) ......................................................................................... 24

30 C.F.R. § 251.82(a)(3) ........................................................................................ 22

**INTRODUCTION**

Plaintiffs challenge the United States Forest Service's implementation of its Wild Horse & Burro ("WH&B") Management Program under the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. § 1331 *et seq.*, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq. See* Plaintiffs' Opening Brief ("Pls.' Br."), ECF No. 37. Plaintiffs claim that the Forest Service has unreasonably delayed removing wild horses from the Devil's Garden Plateau Wild Horse Territory ("Devil's Garden Territory"), in alleged violations of the Administrative Procedure Act ("APA") and the Wild Horse Act. Under NFMA, Plaintiffs allege that the Forest Service failed to comply with the Territory Management Plan for the Devil's Garden Territory by failing to maintain wild horses within the appropriate management level. Plaintiffs also allege that the elimination of grazing from allotments is a reallocation of forage to wild horses that violates the Forest Plan under NFMA. As a remedy, Plaintiffs urge this Court to compel the Forest Service to remove excess horses to within the appropriate management level.

Plaintiffs' arguments, however, are misplaced. Plaintiffs' Wild Horse Act claim fails because, although there is no dispute there has been some delay in removing horses, under the current circumstances, the Forest Service's delay has been reasonable. The Forest Service has and is doing everything practicable – in the face of complex and substantial challenges – to address the serious range conditions on the Devil's Garden Territory (and all the other territories within its jurisdiction). Plaintiffs' two NFMA claims present essentially the same argument and both fail for the same reasons. First, Plaintiffs failed to exhaust their administrative remedies. Second, even if Plaintiffs had met their exhaustion obligations, faulting the Forest Service for allegedly failing to meet the wild horse population objectives in the Forest Plan for the Modoc National Forest does not present a cognizable claim under the APA. As the Supreme Court held in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), such planning goals and objectives are not judicially enforceable. 542 U.S. 55 (2004). Therefore, for all of these reasons, the Court should reject Plaintiffs' arguments and misguided invitation to judicially manage the Forest Service's Wild Horse Program.

1

**BACKGROUND**

**I.    STATUTORY BACKGROUND**

   **A.  The Wild Free-Roaming Horses and Burros Act**

   Enacted in 1971, Congress intended the Wild Horse Act to address concerns that wild horses were vanishing from the West, and to preserve them as "living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. But within a few years after the Wild Horse Act's enactment, the situation had reversed itself "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)). As a result, Congress later amended the Wild Horse Act to provide both the Forest Service and the Bureau of Land Management ("BLM") with greater authority and discretion to carry out the Wild Horse Act's statutory mandate. *Id.*

   With respect to Federal public lands, Section 3 of the Wild Horse Act grants the Forest Service and the Bureau of Land Management authority over wild horses on Federal lands according to their jurisdictions and directs the agencies to protect and manage these animals "as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance" on those lands. 16 U.S.C. § 1333(a). The agencies implement the Wild Horse Act by first establishing localized Forest Service horse territories or BLM herd management areas and then setting appropriate management levels for the wild horse populations within each area. 16 U.S.C. §§ 1332(c), 1333(b)(1). The agencies typically define a management range—bounded by a "low appropriate management level" and "high appropriate management level"—for each horse territory or herd management area. In conjunction with a requirement that the agencies maintain a current inventory of wild horses, the Wild Horse Act authorizes the agencies to use a variety of methods to achieve appropriate management levels, including (but not limited to) the removal and destruction of "excess animals." 16 U.S.C. § 1333(b)(1). As relevant, the Wild Horse Act defines "excess animals" as those "wild free-roaming horses or burros . . . which must be removed from an area in order to preserve and

maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f).

Before the agencies may remove wild horses from a given horse territory or herd management area, the Wild Horse Act requires that the agencies use current information to make two determinations: first, "an overpopulation exists on a given area of the public lands," *id*. § 1333(b)(2); and second, that instead of addressing overpopulation through options "such as sterilization, or natural controls on population levels," *id*. § 1333(b)(1), "that action is necessary to remove excess animals," *id*. § 1333(b)(2). *See also Wyoming v. BLM,* 839 F.3d 938, 943-45 (10th Cir. 2016); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1062 (9th Cir. 2014). Once the Forest Service or BLM makes these determinations, the Wild Horse Act provides that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). The Wild Horse Act establishes an order of priorities when removing excess horses but does not establish a specific statutory deadline for the completion of any particular removal action. *Id*

## B.  The National Forest Management Act

NFMA was enacted in 1976 as an amendment to the Forest and Rangeland Renewable Resources Planning Act of 1974. 16 U.S.C. § 1600, *et seq*. These statutes, along with the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531, provide the principal direction to the Forest Service regarding how Congress intends for it to manage approximately 190 million acres of National Forest System lands. The intent of NFMA is to "provide effective guidance . . . but [to] allow enough flexibility so that the professional foresters can do the job, rather than lawyers and judges." Joint Hearings, 94th Cong., 2d Sess. 953-54 (Comm. Print 1976). "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands." *Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (en banc).

The Multiple-Use Sustained-Yield Act leaves the Forest Service with broad discretion to determine how to meet the mandate of providing for multiple-use on a sustainable basis. The agency may weigh and choose the proper mix of uses within any area, including determining

3

some areas are inappropriate for some uses. *See Sierra Club v. Hardin*, 325 F. Supp. 99, 123 (D. Alaska 1971) ("[T]he proper mix of uses within any particular area is left to the sound discretion and expertise of the Forest Service."). As the Ninth Circuit observed, the agency's multiple-use mandate, which is framed "in such terms as 'that (which) will best meet the needs of the American people' and 'making the most judicious use of the land,' can hardly be considered concrete limits upon agency discretion. Rather, it is language which 'breathe(s) discretion at every pore.'" *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975)). The Multiple-Use Sustained-Yield Act explicitly provides the Forest Service with authority to manage forests for "less than all of the resources." 16 U.S.C. § 531(a). If a specific forest determined that it could not provide a particular multiple-use without "impair[ing] the productivity of the land," it would be well within the Forest Service's statutory authority to prohibit that use. *Id.*[1]

The Forest Service manages the National Forests pursuant to NFMA and its implementing regulations, which provide for forest planning and management at two levels:  the forest-wide level and the individual project level. *See* 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest-wide level, the Forest Service creates general, forest-wide planning goals memorialized in a "Land and Resource Management Plan (forest plan), which consists of broad, long-term plans and objectives for the entire forest." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (citation omitted). A forest plan establishes planning goals and objectives for management of forest resources. 16 U.S.C. § 1604(g).

---

[1] BLM, who also plays a significant role in the Forest Service's WH&B Program on the western range, manages public lands pursuant to the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787, which directs the Secretary of the Interior acting through the agency, to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed by the agency. 43 U.S.C. § 1732(a). Like NFMA, while the Federal Land Policy and Management Act requires BLM (and the Forest Service) to follow multiple-use principles in general terms, it contains broad grants of discretion and imposes few, if any, specific directions on how the agency allocates resources among competing uses. *See, e.g., Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1268 (10th Cir. 2011).

4

At the project level, the Forest Service proposes, analyzes, and authorizes site-specific actions, which must be consistent with the forest plan and other applicable law. *Id*. § 1604(i). Project-level decisions to authorize livestock grazing on National Forests are made through the process under the National Environmental Policy Act and implemented through term grazing permits and allotment management plans. 36 C.F.R. § 222.2. An allotment is "a designated area of land [on a National Forest] available for livestock grazing." *Id*. § 222.1(b)(1). "Unless otherwise specified by the Chief, Forest Service, all grazing and livestock use on National Forest System lands . . . must be authorized by a grazing or livestock use permit," and such permits "convey no right, title, or interest held by the United States in any lands or resources." *Id*. § 222.3(a), (b). Term grazing permits may be issued for terms up to 10 years. *Id*. § 222.1(b)(5)(ii).

To implement term grazing permits, ongoing livestock grazing operations are monitored and adjusted within the scope of the permit and allotment management plans through issuance of annual operating instructions. The annual operating instructions set forth "authorized dates of grazing ('season of use'), pasture and grazing system rotations, numbers of livestock permitted for the upcoming season, monitoring and reporting requirements and maximum limits of forage use by livestock." *Or. Nat. Desert Ass'n v. U.S. Forest Serv*., 2004 WL 1293909, at *2 No. Civ. 03-213-K (D. Or. June 10, 2004). Since the annual operating instructions are issued annually, they can be responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the allotment management plans or grazing permit. *Or. Nat. Desert Ass'n v. U.S. Forest Serv*., 465 F.3d 977, 980-81 (9th Cir. 2006). For instance, during drought conditions the permittee may not be allowed to turn out livestock on the allotment until the drought conditions subside. Such instructions would be included in the annual operating instructions.

### C.  The Administrative Procedure Act

Because the Wild Horse Act and NFMA do not contain an independent grant of jurisdiction or cause of action, the APA governs judicial review of the Forest Service's compliance with the Wild Horse Act and NFMA. *See In Def. of Animals*, 751 F.3d at 1061. Failure-to-act claims "under § 706(1) can proceed only where a plaintiff asserts that an agency

5

failed to take a *discrete* agency action that it is required to take." *SUWA*, 542 U.S. at 64. Courts cannot, under Section 706(1), compel agencies to comply with "broad statutory mandates" that are "mandatory as to the object[s] to be achieved" but that leave agencies with "discretion in deciding how to achieve" those objectives. *Id*. at 66–67; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). The APA imposes this strict limit on a court's jurisdiction "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66.

Thus, relief under Section 706(1), is "reserved only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000); *see also SUWA*, 542 U.S. at 63. Although courts may sometimes compel an agency to "act within a reasonable time," *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982), they are "ill-suited to review the order in which an agency conducts its business" and "hesitant to upset an agency's priorities by ordering it to expedite one specific action." *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987). Thus, the circumstances in which judicial intervention is appropriate are "very limited." *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (limiting review of delayed agency action claims to "extraordinary circumstances").

## II.    FACTUAL BACKGROUND

### A.  The Forest Service's National Wild Horse and Burro Program

The Forest Service's Wild Horse & Burro Program manages wild horses in seven western states in 34 active WH&B territories. *See* Thomas Walter Frolli Declaration ("Frolli Declaration") ¶ 4.[2] These WH&B territories are located in Montana, New Mexico, Arizona,

---

[2] Ordinarily, courts reviewing final agency action under the APA are strictly limited to the administrative record and may refer to extra-record materials only in limited circumstances. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976). However, where a court must decide whether an agency has "unreasonably delayed" required action under 5 U.S.C. § 706(1), "there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). Thus, judicial review pursuant to §

Nevada, Utah, California, and Oregon. *Id*. As of 2014, the estimated population on all National

Forest System lands in these seven states totaled approximately 6,490 animals. *Id*. This total is

nearly three times the number of horses in these territories recommended by the relevant Forest

Service land use plans. *Id*. And, due to rapid reproduction rates, horse populations increase

approximately 25% each year. AR879.[3]

### 1.   Partnership with the Bureau of Land Management

Twenty-three of the 34 active territories are also part of larger Joint Management Areas

with BLM herd management areas. Frolli Decl. ¶¶ 4, 6. Joint Management Areas are complexes

in which the wild horses or wild burros roam back and forth across administrative boundaries –

*i.e.*, horses move back and forth among established BLM herd management areas and Forest

Service territories. *Id*. The two agencies have a long-time partnership in managing these areas.

*Id*. ¶¶ 14, 27; *see also* AR2950; AR5947. Because of BLM's significant expertise and experience

in wild horse management, its extensive network of off-range holding facilities, established

adoption program, etc., the Forest Service is dependent on BLM in the implementation of its

WH&B Program. *Id*. ¶¶ 15-19, 27.

While the partnership is advantageous and essential for both agencies, the dependence on

BLM presents complications for the Forest Service's WH&B Program. For example, while

acting within the partnership, the Forest Service is subject to all of the Congressional limitations

and prohibitions placed on BLM – *e.g.*, the prohibition on destruction of excess horses, sale

without limitations, etc. *Id*. ¶¶ 12, 19, 27, 34(c). Also, the partnership effectively makes BLM's

WH&B challenges those of the Forest Service as well. As part of its WH&B Program, BLM

manages an estimated population of nearly 73,000 wild horses and burros on the herd

management areas scattered throughout 10 western states. *Id*. ¶ 18. This total is more than twice

---

706(1) is "not limited to the record as it existed at any single point in time" and may require
evaluation of extra-record materials. *Id*.

[3] References to "AR#####" in this brief or in the Frolli Declaration refer to the "MODOC"
bates-stamp numbering in the bottom-center of each page in the administrative record.

the number of horses on the open range recommended by the relevant BLM land use plans. *Id.*
And, like the horses on Forest Service territories, the populations on these herd management
areas increase about 25% every year. AR879.

### 2. Challenges Facing Wild Horse Management and Removal Efforts

Although the Wild Horse Act's management direction to the Forest Service and BLM
appears straightforward, reality introduces significant complexity into the management equation
– especially with respect to both agencies' ability to remove additional horses from the western
range. First, over the past decades, the agencies together have removed hundreds of thousands of
wild horses from the open range and now jointly pay to board nearly 50,000 of these horses at
off-range facilities. Frolli Decl. ¶ 34(d). Due to the decrease in market demand for horses in
general, *see id.* ¶ 34(e), the agencies are increasingly unable to find suitable homes for healthy
excess horses through the adoption program, *id.* ¶ 34(d). And, to further complicate this problem,
BLM (and the Forest Service acting within the partnership) are not permitted to humanely
destroy healthy, unadopted horses or conduct any sale that ultimately results in their destruction.
*Id.* ¶ 19; *see also* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-
235, 128 Stat. 2130, 2399 (2014) ("Appropriations herein made shall not be available for the
destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its
contractors or for the sale of wild horses and burros that results in their destruction for processing
into commercial products."); *In Def. of Animals*, 751 F.3d at 1059 n.3. This means that the
agencies must pay these boarding expenses over the entire lifetime of the vast majority of these
horses, at a staggering and escalating cost. *Id.* ¶ 34(b). As a result, much of both agencies' horse-
management budget is now fixed and committed to off-range boarding costs. *Id.* ¶¶ 23, 26
(explaining that nearly 74% of the Forest Service's FY 2016 budget dedicated to WH&B
management was paid to BLM to help cover fixed boarding costs); *id.* ¶ 34(b) (explaining that
nearly 70% of the Forest Service's FY 2017 budget dedicated to WH&B management was paid
to BLM to help cover fixed boarding costs). Second, the agencies' ability to remove additional
horses from the open range is also limited by the lack of boarding space at off-range facilities.
Many of the current boarding facilities are at or near maximum capacity. *Id.* ¶¶ 28-30, 34(d).

And, due to high-quality standards and a lengthy procurement process, securing additional off-range facilities is a difficult and long process. *Id*. ¶ 34(d).

As a result of the significant boarding costs and the lack of boarding space at off-range facilities, the agencies only remove approximately 3,500-4,000 horses a year from the open range throughout the West. *Id*. ¶ 34(d). This rate is generally equivalent to the number of horses that annually leave the off-range facilities by sale, adoption, or death. *Id*. This average yearly removal of horses from the western range is allocated among all seven states with Forest Service territories and the 10 western states with BLM herd management areas. *Id*. Removals are determined according to the most pressing and urgent needs at any given time in all of these states/areas. *Id*. ¶ 28. Removals are also subject to other mission critical priorities such as catastrophic wildfire suppression, efforts to combat drought, public health/safety issues, and enhancement of water resources. *Id*. ¶ 25.

## B.  The Devil's Garden Plateau Wild Horse Territory

The Devil's Garden Plateau Wild Horse Territory comprises almost 258,000 acres on the Modoc National Forest. AR1102. It is the largest wild horse territory managed by the Forest Service in size and wild horse population. AR6058; AR6063. The Devil's Garden Territory is also jointly managed with BLM as a Joint Management Area. An aerial inventory in February 2016 indicated wild horse population size had doubled since 2013 (from an estimated 1,128 in 2013 to 2,246 adult horses in 2016). AR6058. The Devil's Garden herd has shown an historic annual growth rate of 20-25%, and 2018 estimates are approximately 3,900 wild horses in the area now. AR879; AR3850; AR6956. This is almost 10 times the upper appropriate management level defined in the Devil's Garden Territory Management Plan. AR6058; AR6063; AR6066.

### 1.  The Devil's Garden Territory Management Plan

In August 2013, the Modoc National Forest approved a Devil's Garden Territory Management Plan. AR1097. The primary goal of the Plan is to implement management of wild horses in the Devil's Garden Territory for the next 15-20 years as a self-sustaining population of healthy animals in a thriving natural ecological balance. AR1102. The Plan did the following:

- Based on an in-depth analysis of resource monitoring and other data, the Plan adjusted the appropriate management level for the Devil's Garden Territory to 206-402 adult wild horses, AR1105-07;

- Based on the same analysis of resource monitoring and data, the Plan (and supporting documents) made an "excess" determination under the Wild Horse Act. It determined that an overpopulation existed on the Devil's Garden Territory and that removal was required. AR144 (determining that an overpopulation exists on the territory and that removal is required); Frolli Decl. ¶¶ 35-37.

- Outlined a five-year phased gather/removal plan to start removals as soon as October 2013 and to have the horse population numbers down to within the appropriate management level by 2016. *See* AR863 (requiring gathers as soon as October 2013); AR1117 (setting a goal to be within the appropriate management level by 2016); and

- Identified helicopter-assisted gathers and bait/water trapping as the primary gather methods, AR1111-12.

### 2.  Actions Taken Since 2013 To Address Excess Horses In The Territory

In the fall of 2016, the Forest Service and BLM conducted a gather and captured approximately 291 horses outside the Devil's Garden Territory on private and Tribal lands – horses that had expanded beyond the administrative boundaries of the Territory. AR1584. While the gather was not implementation of the Devil's Garden Territory Management Plan (because it was for horses on private and Tribal lands), the agencies used the Plan to guide the gather and removal. The agencies transferred the excess horses to BLM's Litchfield Short-Term Holding Facility. AR1584.

In 2017, the Modoc National Forest started working on an implementation strategy to reach the appropriate management level "in the shortest possible timeframe due to the irreversible ecological damage occurring as a result of overpopulation." AR2926. The strategy is developing several options to try and address the current challenges to excess horse removal (as discussed above), *see* Frolli Decl. ¶¶ 38-43:

10

- The Forest Service has re-assigned funding within National Forest System appropriated funds and supplemented the Modoc National Forest's budget by $916,649. *Id.* ¶ 26.

- The Forest Service has requested funds to construct a new wild horse short-term holding facility, with an anticipated maximum capacity of 500 animals. It is expected that a Forest Service short-term holding facility will be less expensive than contracting the services of a BLM facility, provide management options for adjacent territories (Klamath and Ochoco National Forests), and allow for more flexibility in bait-trapping, disposition of horses (*i.e.*, not subject to Congressional prohibitions on sale and destruction), and responding to emergency situations on the Devil's Garden Territory. AR1586; Frolli Decl. ¶ 41.

- The Forest Service is currently defining the authorities needed to sell older and unadopted horses, as well as to conduct adoptions without the support of BLM. AR1586.

- The Forest Service has requested funds for one or more gathers in the Fall of 2018 and/or 2019. The Forest Service has initiated planning for the gather(s) and requisition of a gather contractor. Frolli Decl. ¶ 43.

## ARGUMENT

## I.   JUDICIAL MANAGEMENT OF THE FOREST SERVICE'S WILD HORSE PROGRAM IS IMPROPER AND ILL-ADVISED.

Plaintiffs first argue that, because the Forest Service made a 2013 "excess" determination – *i.e.*, determined that an overpopulation was present on the Devil's Garden Territory and that removal was necessary – the agency now has a mandatory duty to remove horses under Section Three of the Wild Horse Act and that it has failed to do so. Pls.' Br. at 13-18, 23-29. As their requested relief, Plaintiffs demand that this Court compel the Forest Service to immediately remove horses from the Territory to meet established appropriate management levels. *Id.* The Forest Service acknowledges its mandatory duty to remove horses from the Devil's Garden Territory. The Forest Service also acknowledges that it has not yet commenced removal following the 2013 excess determination. However, in the face of the substantial challenges imposed by Congress, the Forest Service's delay has been reasonable. The Forest Service has diligently worked to address these challenges and remove horses as quickly as possible. Under

11

these circumstances, judicial management of the Forest Service's WH&B Program is inappropriate and ill-advised. Therefore, the Court should reject Plaintiffs' argument and deny their requested relief.

### A.  Unreasonable Delay Is Determined On A Case-By-Case Basis.

Plaintiffs do not attempt to quantify a period of time that constitutes unreasonable delay under these circumstances but argue nonetheless that this case qualifies. Pls.' Br. at 23-29. Contrary to Plaintiffs' implication, there is no "*per se* rule as to how long is too long to wait for agency action." *In re Core Commc'ns*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citation omitted); *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). This is especially true in this case where the Wild Horse Act does not impose any specific statutory deadlines. *Compare* 16 U.S.C. § 1333(b)(2) (providing a more general timeframe under the Wild Horse Act that the agency "shall immediately remove excess animals from the range so as to achieve appropriate management levels") *with* 16 U.S.C. § 1533(b)(3)(A) (providing a specific timeframe under the Endangered Species Act that, within 90 days of receipt of a petition to list a species as threatened or endangered, "the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted"). Rather, under these circumstances, courts apply the "*TRAC*" factors to determine, on a case-by-case basis, whether an agency's delay of a discrete duty is so egregious as to warrant judicial intervention. *Telecomms. Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984); *see also W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017), appeal docketed, No. 17-4161 (10th Cir. Oct. 13, 2017) (applying the *TRAC* factors in a "failure to act" case under the Wild Horse Act). When balancing these factors, a court "must remember that, '[a]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a . . . proceeding is entitled to considerable deference.'" *Sierra Club*, 828 F.2d at 797 (citation omitted).

The *TRAC* balancing factors are:

(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed . . . that statutory scheme may supply content for this rule

12

of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) . . . the effect of expediting delayed action on agency activities of a higher or competing priority; (5) . . . the nature and extent of the interests prejudiced by the delay; and (6) the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'

*Brower v. Evans*, 257 F.3d 1058, 1068 (9th Cir. 2001) (citations omitted). Unreasonable delay is determined on a case-by-case basis, is unique in every circumstance, and is not present in this case.

**B.  On Balance, The Forest Service's Actions On The Devil's Garden Territory Have Been Reasonable.**

**1.  Under the first three *TRAC* factors, the Court considers the reasonableness and consequences of delay in the context of the Wild Horse Act, but these factors are not dispositive.**

The first three *TRAC* factors evaluate the extent and consequences of the delay. *See Brower*, 257 F.3d at 1068 (considering the timetable in the relevant statutory scheme for an indication of reasonableness); *TRAC*, 750 F.2d at 80 (analyzing the consequences from the delay). Here, the Forest Service's obligation to "immediately remove" excess horses in the territory arose after the agency identified an overpopulation in the Devil's Garden Territory and determined that action was necessary to remove horses. *See Wyoming*, 839 F.3d at 944; *In Def. of Animals*, 751 F.3d at 1062. The Forest Service made this determination in 2013. AR144; Frolli Decl. ¶¶ 35-37. Although "immediately" certainly does not equate to instantaneously as Plaintiffs seem to suggest, Federal Defendants acknowledge that a five-year delay is not insubstantial and also acknowledge that there have been negative consequences to the range, the Devil's Garden wild horse herd, and the local ranching economy. While such a delay may seemingly be in tension with the Wild Horse Act's mandate, as explained below, under the circumstances here, it is not unreasonable.

**2.  *TRAC* factors four and five—the Forest Service's administrative difficulties bearing on its ability to address wild horse populations weigh against a finding of unreasonable delay.**

13

The fourth and fifth *TRAC* factors give "due consideration in the balance to 'any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.'" *Int'l Chem. Workers*, 958 F.2d at 1149–50; *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) (explaining that courts should consider "the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency"). In delineating these factors, the *TRAC* court emphasized "the effect of expediting delayed action on agency activities of a higher or competing priority." 750 F.2d at 80.

The Forest Service's and BLM's efforts to both successfully and sustainably manage wild horse populations pursuant to the Wild Horse Act are hindered by substantial administrative obstacles imposed by Congress. The Wild Horse Act demands that the agencies continually monitor and manage tens of thousands of wild horses – nearly 6,500 wild horses scattered across Forest Service territories in seven western states and nearly 73,000 wild horses scattered across BLM herd management areas in 10 western states – and periodically remove excess animals in the following "order and priority": first, the agencies must humanely euthanize "old, sick, or lame animals," 16 U.S.C. § 1333(b)(2)(A); then the agencies are to facilitate the adoption of healthy animals "for which [it] determines an adoption demand exists by qualified individuals," *id.* § 1333(b)(2)(B); and, finally, the agencies must humanely euthanize any "additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist," *id.* § 1333(b)(2)(C). While subsection (b)(2)(C) clearly contemplates the humane destruction of healthy excess animals as an available population management tool, Congress has not appropriated any funds for euthanasia. In fact, even more than merely declining to appropriate funds, Congress has categorically prohibited BLM, and the Forest Service when working with BLM (which is most of time), from using the minimal funds it does appropriate for "the destruction of healthy, unadopted wild horses and burros in the care of [the agency] or its contractors." *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399; *In Def. of Animals*, 751 F.3d at 1066 n.20 ("Congress has barred the BLM from euthanizing healthy excess horses for which there is no adoption demand . . . by

14

1   continually declining to appropriate funds for the destruction of these animals.") (citing Pub. L.

2   No. 111-88, 123 Stat. 2904, 2907 (2009)).

3       As a result, the agencies find themselves in a no-win situation. Congress demands that the

4   agencies will comply with the Wild Horse Act's mandate to maintain wild horse populations at

5   established appropriate management levels, but has eliminated one of the critical mechanisms the

6   Wild Horse Act provides in order to make such a mandate workable and has failed to appropriate

7   sufficient funding to address the exploding horse population numbers in other ways. Frolli Decl.

8   ¶¶ 12, 19, 21, 27, 34(c). The Forest Service acknowledges that extensive euthanasia of healthy

9   wild horses is not a popular or perhaps even a palatable solution to excess horses, but it may very

10  well be the only way the statutory scheme, as written, can actually work. But Congress has

11  effectively disabled the statutory scheme, forcing the agencies to focus their disposition of

12  removed horses almost exclusively on facilitating private adoption under subsection (b)(2)(B)

13  and other methods – without providing the necessary increased budget allocations to address the

14  rising population numbers through these other methods.

15      Unfortunately, adoption demand has plummeted, *id*. ¶ 34(e), and there is not a big market

16  demand for sales with limitations, *id*. ¶ 34(d). As a result, a staggering chunk of the agencies'

17  wild horse management budget must be allocated to permanently board nearly 50,000 unadopted

18  animals in off-range facilities. *Id*. ¶ 23, 26 (explaining that nearly 74% of the Forest Service's

19  FY 2016 budget dedicated to WH&B management was paid to BLM to help cover fixed

20  boarding costs); *id*. ¶ 34(b) (explaining that nearly 70% of the Forest Service's FY 2017 budget

21  dedicated to WH&B management was paid to BLM to help cover fixed boarding costs). Over a

22  lifetime, each unadopted horse will require thousands of dollars for adequate care and upkeep.

23  Moreover, the off-range facilities used to house these animals are currently at or nearing capacity

24  and, in the face of continual cuts in appropriated annual budgets, securing additional off-range

25  boarding facilities is prohibitively expensive or difficult to procure. *Id*. ¶ 34(d). These practical

26  realities restrict the agencies' removal efforts to approximately 3,500-4,000 wild horses per year,

27  a number roughly equivalent to the total number of animals that leave the system annually

28  through adoption, sale, and natural mortality. *Id*. ¶ 34(d). Given these administrative obstacles,

simply removing wild horses from the range, as Plaintiffs demand, is simply not a viable

management option. For these reasons, these overwhelming administrative difficulties weigh

strongly against any unreasonable delay on the part of the Forest Service.

This is so even when weighing these administrative obstacles against the potential harm

of continual delay. *Cutler*, 818 F.2d at 898. In evaluating that balance, the court must consider

"the importance of 'competing priorities' in assessing the reasonableness of an administrative

delay." *Mashpee Wampanoag*, 336 F.3d at 1100 (quoting *In re Barr Labs.*, 930 F.2d 72, 75 (D.C.

Cir. 1991)). The *Mashpee Wampanoag* court noted that a previous panel had denied mandamus

relief, "even though all the other factors considered in *TRAC* favored it, where 'a judicial order

putting the petitioner at the head of the queue would simply move all others back one space and

produce no net gain.'" *Id*. Here, the agencies must balance wild horse populations and rangeland

health not only in California on the Modoc National Forest, but across numerous other wild

horse territories and herd management areas scattered across numerous western states. Frolli

Decl. ¶ 2. This juggling act requires maintenance of wild horse populations that are collectively

way over the population limits set in Forest Service and BLM land use plans. *Id*. ¶¶ 4, 18. And,

due to fast reproduction rates, the population numbers are exploding. Due to Congressional

budget cuts and prohibitions on destruction and sales without limitations, removing even a

substantial portion of that overpopulation across the western range is outside of the agencies'

budgetary and logistical reach.

Instead, the agencies must prioritize removal efforts in areas with the most pressing and

urgent needs at any given time. *Id*. ¶¶ 28-30. Prioritizing Plaintiffs' demands for removal would

simply force the Forest Service, which is nearly entirely dependent on BLM's expertise and off-

range holding facilities, to alter determinations and priorities both agencies have already made

about the most pressing and urgent needs for removal in California and in numerous other states

containing rangelands burdened by excess wild horses. For these reasons, this Court should resist

Plaintiffs' requested relief and not disrupt the agencies' balancing of competing priorities within

their respective WH&B Programs, especially where granting relief in this case would simply

shift the harm of overpopulation from one region or National Forest to another. *See Mashpee*

*Wampanoag*, 336 F.3d at 1100. "The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for [this court] to hijack." *See Barr Labs.*, 930 F.2d at 76. Because the agencies' delay in this instance stems from limited resources allocated among competing priorities, and complete removal is hindered by the practical and administrative obstacles outlined above, the Court should find that the fourth and fifth *TRAC* factors weigh heavily in the agencies' favor despite the harm present in the delay here.

Additionally, in certain cases, "the good faith of the agency in addressing the delay weighs against" a finding of unreasonable delay. *See Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 119–20 (D.D.C. 2005) (citing *In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988)). There is no indication here that the agencies are "just 'twiddling their thumbs'" as to their management responsibilities. *See Wyandotte Nation v. Salazar*, 939 F. Supp. 2d 1137, 1153 (D. Kan. 2013) (quoting *Mashpee Wampanoag*, 336 F.3d at 1100–01). To the contrary, the Forest Service (and BLM) has made genuine efforts to mitigate the harm caused by wild horse overpopulations and has devised what it believes is the best approach available given the Congressional obstacles and its limited resources. Frolli Decl. ¶¶ 38-43 (allocating more budget money to the Modoc National Forest, planning the construction of a new Forest Service holding facility on the Modoc, planning a gather for 2018/2019, etc.). While these efforts may not immediately remediate the situation, they reflect the reality that the Forest Service has in no way abandoned its management responsibilities, and instead is diligently trying to address its legal charge to the best of its ability under the circumstances. Thus, the situation here does not indicate a true "breakdown of regulatory processes." *See Int'l Chem. Workers*, 958 F.2d at 1149 (quoting *Cutler*, 818 F.2d at 897 n.156). In sum, the agency's good faith efforts to mitigate harm also weigh against a finding of unreasonable delay.

**3. The complexity of a remand to the Forest Service and the Court's lack of expertise in managing wild horses counsels against a finding of unreasonable delay.**

1   Finally, while not technically a factor delineated by the *TRAC* court, a reviewing court,

2   has to consider "the complexity of the task envisioned by a . . . remand order" in this case,

3   especially given Plaintiffs' requested relief. *See Qwest Commc'ns Int'l v. FCC*, 398 F.3d 1222,

4   1239 (10th Cir. 2005). A court must also evaluate the logistical implications of a mandatory

5   injunction for both the Forest Service and the court. In making this review, a court should be

6   mindful that the Supreme Court has interpreted 5 U.S.C. § 706(1) circumspectly, so as to

7   "protect agencies from undue judicial interference with their lawful discretion, and to avoid

8   judicial entanglement in abstract policy disagreements which courts lack both expertise and

9   information to resolve." *See SUWA*, 542 U.S. at 66-67 (citing the Wild Horse Act as a specific

10  example of an area where courts lack expertise and should avoid judicial entanglement). In other

11  words, evaluation of this factor requires a frank acknowledgement of the fact that mandatory

12  injunctive relief is necessarily disruptive of agency priorities and programming. Moreover, the

13  issuance of such relief often requires the district court—ill-equipped to evaluate either agency

14  priorities or programming—to wade into the administrative murk by ordering specific agency

15  action and monitoring compliance. Consequently, "it is clear that a court-imposed deadline for

16  agency action constitutes an extraordinary remedy." *Int'l Chem. Workers*, 958 F.2d at 1149

17  ("[I]n extraordinary circumstances, this court will review claims of unreasonable agency

18  delay."); *Wyandotte Nation*, 939 F. Supp. 2d at 1151 ("A mandatory injunction is a drastic

19  remedy that should be reserved for the most extraordinary circumstances.").

20  Here, Plaintiffs request that this Court enter an order compelling the Forest Service to

21  immediately remove excess horses from the Devil's Garden Territory. Pls.' Compl. at p. 24. This

22  request, however, is loaded with complexity. First, the task itself would require the mobilization

23  of significant resources and the restructuring of long-term plans and programming already

24  underway in the Devil's Garden Territory and other territories in seven other states. Frolli Decl.

25  ¶¶ 20-25, 38-43. Additionally, these long-term plans and programming are dependent on BLM as

26  a partner agency – an agency that is not before this Court in this case. As explained above,

27  practical and administrative realities preclude the agencies from removing more than

28  approximately 3,500-4,000 wild horses across the western range in any given year. *Id*. ¶ 34(d).

18

Here, requiring the immediate removal of excess wild horses in the Devil's Garden Territory would involve the removal of well over half of the agencies' yearly limit – *i.e.*, it would involve reducing the nearly 3,900 head of wild horses down to the appropriate management level of 402. An order from this court compelling removal would force the Forest Service to focus its limited resources to a disproportionate degree on this one area of California. Such a broad reallocation of resources would undoubtedly necessitate the wholesale reevaluation of established long-term removal plans not only in California, but also across all the other relevant western states between two separate Federal agencies. Removal plans for other states and other territories and herd management areas would be disrupted and meaningful rangeland management goals throughout the western United States would be frustrated. *Id*. ¶ 30. Importantly, for the Forest Service especially, wholesale reevaluation of removal plans would almost certainly affect budget plans set aside for other mission-critical functions like forest fire suppression/restoration, addressing drought, enhancing water resources, public safety on roads/recreation areas, etc., *id.* ¶¶ 21, 25, 34(a), which are all important and critical priorities for ranching interests. Thus, while Plaintiffs claim to seek to compel a "discrete . . . action that [the agencies are] required to take," *SUWA*, 542 U.S. at 64, an order from this court compelling that "discrete action" will certainly have much broader detrimental implications that extend well beyond the Forest Service's WH&B Program.

Further, should the Forest Service fail to comply with such a court's order – which, given the Congressional obstacles imposed on the agencies, such an order compelling immediate gathers would be fraught with difficulty – or if the Forest Service simply does not comply as quickly as Plaintiffs believe is warranted, this litigation would likely devolve into protracted proceedings seeking to enforce the Court's order. Such proceedings would again delve into an ultimately superficial debate about the Forest Service's budget and require the court to superintend the agency's nuanced resource allocations which, as explained above, extend way beyond the Forest Service's WH&B budget. Another important consideration is that the success of a given removal operation is largely tied to unpredictable conditions on the ground— inclement weather, the horses' fluctuating resistance to various trapping methods, and even the

day-to-day movement of individual horses can affect the scope and outcome of a removal. The Court would be forced to closely scrutinize these conditions in order to evaluate the pace and scope of the Forest Service's efforts and, further, to appraise the Forest Service's expert opinions on scattered horses on any given day of a removal operation, the genetic viability of a particular band or herd, why a certain proportion of horses cannot be removed in one roundup, the effectiveness of helicopter sweeps versus water-baiting, etc. The Court is simply not equipped to make these sorts of determinations and doing so would most certainly amount to undue judicial interference with the Forest Service's WH&B Program. *See SUWA*, 542 U.S. at 66. For these reasons, the Court should not find unreasonable delay in this case.

In sum, the Forest Service finds itself in an extremely challenging and untenable situation with the current state of the range and, due to Congressional budget cuts and horse-management prohibitions, the unenviable task of dealing with identified overpopulations of wild horses on lands that are meant to be managed sustainably for multiple uses. There are profound and complex administrative and practical obstacles imposed on the Forest Service as it, along with BLM, attempts to juggle unworkable statutory responsibilities on a shoestring budget and the prohibition of important statutory tools. The practical realities, coupled with the inadvisability of this Court injecting itself into the agencies' WH&B Program (which would also require the Court to be in the middle of the Forest Service's Fire Suppression Program, Health and Human Safety Program, Vegetation Management Program, among others) in any significant capacity, weigh decisively against a finding of unreasonable delay or the issuance of injunctive relief in this case. Other courts, analyzing the same statute and the same Congressional obstacles, have appropriately declined to find unreasonable delay. *See W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1297. Accordingly, this Court should also find that the Forest Service has not "unreasonably delayed" removal action in the Devil's Garden Territory, *see* 5 U.S.C. § 706(1), and decline Plaintiffs' requested relief.

## II.   PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES FOR THEIR TWO REMAINING NFMA CLAIMS.

### A.   Standards For Exhaustion Of Forest Service Administrative Remedies.

"Where Congress specifically mandates, exhaustion [of administrative remedies] is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (citations omitted). In the case of the Forest Service, an agency in the U.S. Department of Agriculture, Congress has specifically mandated exhaustion:

> **Exhaustion of Administrative Appeals.** Notwithstanding any other provision of law, a person *shall* exhaust *all* administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against (1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e) (emphasis added). In accordance with this statute, the Forest Service has promulgated detailed regulations establishing the agency's administrative appeal procedures. For instance, the Forest Service regulations provide that "[i]t is the appellant's responsibility to provide sufficient project- or activity-specific *evidence and rationale*, focusing on the decision, to show why the Responsible Official's decision should be reversed," including "[h]ow the appellant believes the decision *specifically* violates law, regulation, or policy." 36 C.F.R. § 215.14(a), (b)(9) (emphases added).

The exhaustion requirement established by Section 6912(e) is explicit and admits of no exception: a plaintiff *shall* exhaust *all* administrative remedies before bringing an action in court. As one court has observed, "[i]t is hard to imagine more direct and explicit language" requiring exhaustion of administrative remedies than Section 6912(e). *Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir. 1998) (quoting *Gleichman v. U.S. Dep't of Agric.*, 896 F. Supp. 42, 44 (D. Me. 1995)). Where a statute explicitly requires exhaustion as a prerequisite to judicial review, it should be strictly enforced. *Darby v. Cisneros*, 509 U.S. 137, 153-54 (1993). The Ninth Circuit has found that "a court should require compliance with an exhaustion statute unless the suit alleges a constitutional claim . . . .'" *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 980 (9th Cir. 2002). No such constitutional claim is alleged here.

**B.     Plaintiffs' NFMA Claims Must Be Dismissed Because They Failed To Exhaust Administrative Remedies Prior To Filing Suit.**

When Plaintiffs filed this action, they alleged failures to comply with the Wild Horse Act and NFMA because of the overpopulation of wild horses. But Plaintiffs ultimately object to the Forest Service's decisions to reduce the animal unit month under their grazing permits. Before seeking relief in this Court, those permit decisions must be administratively appealed. Plaintiffs failed to exhaust their administrative remedies prior to filing this action. Thus, the claim that the Forest Service violated NFMA when it altered Plaintiffs' allotments under the annual operating instructions must be dismissed.

The named corporate Plaintiffs, Wilson Ranches and Green Valley Corporation, have grazing permits included in the record. AR3580; AR3688. Both Plaintiffs agreed to the following language when the permit was issued:

> This permit can also be cancelled, in whole or in part, or otherwise modified at any time during the term to conform with needed changes brought about by law, regulation, Executive order, allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions, or the lands described otherwise being unavailable for grazing.  Any suspension or cancellation action may be appealed pursuant to 36 CFR 251, Subpart C.

*Id*. Under 36 C.F.R. § 251.82(a)(3), grazing and livestock use permits are appealable decisions. Yet Plaintiffs did not make an administrative appeal. Thus, their claims that the Forest Service violated NFMA by reducing the animal unit months on their allotments should be dismissed for failure to exhaust administrative remedies as required by Section 6912(e).

III.    **PLAINTIFFS' CLAIMS THAT THE FOREST SERVICE HAS VIOLATED NFMA BY ALLEGEDLY "FAIL[ING] TO ANNUALLY REMOVE EXCESS WILD HORSE POPULATIONS" IS NOT COGNIZABLE PURSUANT TO THE SUPREME COURT'S *SUWA* DECISION.**

Plaintiffs' NFMA claims are not cognizable under the precepts of *SUWA*, 542 U.S. 55, because the 1991 Forest Plan and 2013 Devil's Garden Territory Management Plan provisions that Plaintiffs accuse the Forest Service of violating are not concrete, legally enforceable obligations. Count 2 alleges that the Forest Service failed to comply with the Territory Management Plan under NFMA by failing to maintain wild horses within the appropriate management level and urges this Court to compel the Forest "to perform their duties under the

22

1    1991 Forest Plan, as amended by the TMP." Compl. ¶ 80. In Count 3, Plaintiffs allege that the

2    elimination of grazing from allotments is a reallocation of forage to wild horses that violates the

3    Forest Plan under NFMA.  *Id.* ¶ 91. The Supreme Court in *SUWA* held that such provisions in

4    federal land management plans do not present legally binding commitments and thus are not

5    enforceable under the APA. 542 U.S. at 67-72. Because they do not present a cognizable claim

6    under the APA, Counts 2 and 3 must be dismissed.

A.    **The Forest Plan Provision For Wild Horse Management Is A Statement Of**
      **Objectives Subject To Forest Service Funding And Priorities.**

9          Rather than a static enforceable commitment, the Forest Plan provision for wild horse

10   management is a flexible statement of the Forest's objectives reflecting the complex

11   management issues involved. In accordance with NFMA, 16 U.S.C. § 1604, the Modoc National

12   Forest adopted the Forest Plan in 1991. *See* AR449-845. The Forest Plan provided an estimated

13   18,800 animal unit months for livestock grazing in the first decade with goals to develop and

14   revise allotment management plans so that permitted grazing and forage capacity were balanced

15   by 2000. AR455. The Devil's Garden Plateau Wild Horse Territory Management Plan was an

16   amendment of the Forest Plan to manage wild horses in the territory over the next 15-20 years

17   "as a self-sustaining population of healthy animals in a thriving natural ecological balance with

18   other uses and within the productive capacity of their habitat" as required by the Wild Horse Act.

19   AR1129. The Territory Management Plan was adopted in August 2013. AR1099.

20         During the environmental review for the Territory Management Plan, the Forest Service

21   responded to a wide range of public comments. AR1034-96. Some members of the public

22   worried about the impacts of too many wild horses on livestock and wildlife, while others

23   requested that more forage be allocated to wild horses to allow for an increased population.

24   AR1034; AR1076. The cost of maintaining and removing wild horses was also a factor

25   considered by the agency, AR1035-36, 1043, because the horses are protected pursuant to the

26   Wild Horse Act. Ultimately, after considering public input and the resources required to manage

27   the wild horse population the Forest Service adopted the Territory Management Plan, which

28   attempted to balance these concerns. For example, the Decision Notice includes 17 actions aimed

1    at balancing various concerns, such as managing for a natural sex ratio of 50:50 males to

2    females, monitoring and actions to maintain genetic diversity within the east and west home

3    ranges of the territory, development of water sources, no additional fencing, and gates to be left

4    open when livestock are absent. AR1129-32.

5    **B.      The APA Cannot Be Used To Compel Agency Action Pursuant To The
6              Objectives Of A Federal Land Management Plan.**

7            NFMA directs individual National Forests to prepare "land and resource management

8    plans" (or "Forest Plans") that encapsulate the unique attributes and multiple uses of each forest,

9    and provide guidance in maintaining those values. 16 U.S.C. § 1604. Forest Plans are general

10   frameworks for forest management rather than a list of mandatory requirements:

11           These plans operate like zoning ordinances, defining broadly the uses allowed in
             various forest regions, setting goals and limits on various uses (from logging to
12           road construction), but do not directly compel specific actions, such as cutting of
             trees in a particular area or construction of a specific road.
13

14   *Citizens for Better Forestry v. U.S. Dep't of Agric.* 341 F.3d 961, 966 (9th Cir. 2003); *see also*

15   *Ohio Forestry*, 523 U.S. at 733 (stating that Forest Plans "do not command anyone to do

16   anything or to refrain from doing anything;" "they do not grant, withhold, or modify any formal

17   legal license, power, or authority;" and "they create no legal rights or obligations"). After a

18   Forest Plan is adopted, "[r]esource plans and permits, contracts, and other instruments for the use

19   and occupancy of National Forest System lands shall be consistent with the [Forest Plan]." 16

20   U.S.C. § 1604(i). These site-specific projects authorize specific actions to be implemented on the

21   Forest. *See Ohio Forestry*, 523 U.S. at 729-30 (describing the "considerable legal distance

22   between the adoption of the Plan" and activities implementing that Plan, such as tree cutting).

23           In *SUWA*, the Supreme Court examined enforcement of the analogous federal land

24   management planning regime governing BLM. *See* 542 U.S. at 67 (stating that federal law

25   required that BLM "'shall manage the public lands . . . in accordance with the land use plans'"

26   and that "[a]ll future resource management authorizations and actions . . . shall conform to the

27   approved plan") (quoting 43 U.S.C. § 1732(a) and 43 C.F.R. § 1610.5-3(a), respectively). The

28   plaintiffs in *SUWA* alleged that BLM had failed to "comply with certain provisions in its land use

24

1  plans" and, specifically "in light of damage from ORVs [(off-road vehicles)]" in a particular

2  wilderness study area, that BLM failed to comply with a provision of the land management plan

3  stating that the area "will be monitored and closed if warranted." *Id*. at 67, 68 (citations omitted).

4  The Court found that this claim was not cognizable, holding that such statements in the plan "--

5  like other 'will do' projections of agency action set forth in land use plans -- are not a legally

6  binding commitment enforceable under [the APA]." *Id.* at 72. Further, the Court expressed the

7  need to avoid courts supervising agencies to determine if they have sufficiently complied with

8  their congressional directives, which is not the intent of the APA. *Id*. at 67.

9          The Supreme Court provided its reasoning for this holding as follows:

10          Quite unlike a specific statutory command requiring an agency to promulgate

11          regulations by a certain date, a land use plan is generally a statement of priorities;
        it guides and constrains actions, but does not (at least in the usual case) prescribe

12          them.  It would be unreasonable to think that either Congress or the agency
        intended otherwise, since land use plans nationwide would commit the agency to

13          actions far in the future, for which funds have not yet been appropriated. . . .  A
        statement by BLM about what it plans to do, at some point, *provided it has the*

14          *funds and there are not more pressing priorities*, cannot be plucked out of context
        and made a basis for suit under [the APA].

15

16  *Id*. at 71 (emphasis added). The Court also recognized that allowing a suit to compel compliance

17  with land use plan provisions would cause BLM to produce vaguer land use plans, frustrating

18  coordination with other agencies and depriving the public of information about the agency's

19  long-range intentions. *Id*. at 71-72. The Court's reasoning in *SUWA* similarly applies to the

20  Forest Service's Forest Plans. *See, e.g.*, *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1156 n.9

21  (10th Cir. 2007) ("Our reading of [*SUWA*] reveals that a 'land use plan' promulgated by the

22  BLM does not differ significantly from a [Forest Plan] promulgated by the Forest Service.").

23          Like the land use plan at issue in *SUWA*, the provisions for wild horse management in the

24  Modoc Forest Plan and the Territory Management Plan cannot be plucked out of context and

25  made the basis for a legal claim under the APA alleging that the Forest Service has failed to

26  remove excess wild horse populations. *SUWA*, 542 U.S. at 71. "[A] claim under § 706(1) can

27  proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it

28

25

1  is *required to take.*" *Id*. at 64. Even if the agency is required to take a certain action, a court "has

2  no power to specify what the action must be." *Id*. at 65.

3          1.      **Plaintiffs' NFMA/Territory Management Plan claim in count 2 fails**
                   **to prove a violation.**

4

5          Plaintiffs allege that the failure to gather horses as outlined in the Territory Management

6  Plan is a violation of NFMA. Pls.' Br. 19-20. But the Territory Management Plan's objective to

7  conduct gathers to achieve the appropriate management level is not a legally-binding

8  commitment any more than the call to monitor and protect wilderness study areas in the land

9  management plan at issue in *SUWA* was a legally binding commitment. Although the Territory

10  Management Plan contains a project implementation schedule, AR0001117-18, Plaintiffs ignore

11  that the Territory Management Plan was challenged in litigation that lasted from March 2014 to

12  September 2017. Frolli Decl. ¶ 34(f); *see also American Wild Horse Preservation Campaign v.*

13  *Vilsack*, No. 1:14-cv-00485, (D.D.C Mar. 24, 2017). That litigation sought to set aside the

14  agency's decision and to enjoin the Forest from taking any actions to implement the Territory

15  Management Plan, Frolli Decl. ¶ 34(f), aking it reasonable that the Forest Service has not

16  implemented the Territory Management Plan yet.

17          Further, the schedule was necessarily conditioned on funding, assessment of range

18  conditions, and managing any conflicting priorities. *See* discussion *supra* in Argument Section I.

19  B. Plaintiffs argue that there was not a stated condition in the Territory Management Plan as to

20  the need for further funding or problem solving. Pls.' Br. 20. However, the Environmental

21  Assessment stated that the Territory Management Plan was "conducted with the assumption that

22  adequate funding will be provided for implementation. As Congress provides funding for the

23  Forest Service to manage the National Forest Lands, funding decisions are outside the scope of

24  this project." AR1086-87.

25          Instead of citing any case law that supports their legal arguments, Plaintiffs pull generic

26  principals from cases to apply broadly to the facts. Ultimately, this attempt must fail. In *Stout v.*

27  *U.S. Forest Service*, ranch owners similarly alleged a violation of NFMA because of a failure to

28  maintain a wild horse herd averaging 100 head, but the district court found that the Forest Plan

1    standard was not a mandate that the Forest Service was legally required to implement. 869 F.

2    Supp. 2d 1271 (D. Or. 2012).

3            The *Stout* plaintiffs also challenged the agency's failure to achieve the appropriate

4    management level as a violation of the forest plan. *Id*. at 1273. The court explained that this

5    claim was analyzed pursuant to the APA under Section 706(1), allowing a court to "compel

6    agency action unlawfully withheld or unreasonably delayed." *Id*. at 1276. The court is only able

7    to act under this standard if the action sought is a legally required and discrete action. *Id*. In order

8    to determine if the court should act, there are three questions that must be answered:  (1) whether

9    the goal set forth is discrete; (2) whether the agency is legally required to meet it; and (3)

10   assuming the first two are met, whether it is an agency action that has been unreasonably delayed

11   under the APA. *Id*. at 1279. Enforcing broad statutory mandates would interfere with agency

12   discretion by substituting the judgment of the court with that of the expert agency. *Id*. The court

13   found that the standard concerning reducing the horse herd was not so nebulous as to be

14   unenforceable, but there was not a "clear indication of binding commitment." *Id*. at 1279-80.

15   When applying this test to the facts in this case, Plaintiffs have failed to identify discrete goals,

16   and even if they could, there is no doubt that the Forest Plan and Territory Management Plan

17   "leave[] a measure of discretion to the Forest Service in determining how to manage livestock,

18   whether 'resource conditions meet management goals and standards,' and in determining

19   whether there is a 'conflict[ ] between livestock, big game, and wild horses.'" *Id*. at 1280.

20           **2.      Plaintiffs' NFMA consistency/Plan amendment claim in count 3 also**
21                   **fails to demonstrate a violation of law.**

22           Plaintiffs' Count 3 is an allegation that the changes in their grazing permits are

23   reallocating forage to wild horses in a manner that constitutes a de facto amendment of the Forest

24   Plan without following the procedures of NFMA. Plaintiffs' argument fails because the Forest

25   Plan anticipates changing levels of grazing. As noted above, Federal Defendants have not

26   violated the consistency requirements in NFMA. Contrary to Plaintiffs' assertions, Pls.' Br. 21-

27   22, changes to the amount of livestock grazing occurring in any year on any one allotment do not

28   constitute a violation of NFMA. The Forest Plan anticipated an estimated level of the animal unit

27

1   month for livestock grazing within the first decade, but it recognized that the actual use levels

2   would be determined during site-specific allotment management planning. AR455. The Forest

3   Service sought "to optimize production and utilization of forage available for livestock use

4   *consistent with maintaining the environment and providing for multiple uses of the range*."

5   AR564 (emphasis added). The Forest Plan itself clearly contemplates meeting multiple-use goals

6   and objectives and balancing the conflicting demands for timber, recreation, range, and wildlife.

7   AR451; AR457. One of the Forest's stated goals, is "improved rangeland condition, with

8   permitted grazing and forage capacity in balance." AR587. So specific changes to the amount of

9   livestock grazing in one year are consistent with the Forest Plan.

10       In *Forest Guardians v. U.S. Forest Service*, environmental groups argued that changes in

11  grazing permits to allocate all available forage to livestock violated NFMA. 329 F.3d 1089 (9th

12  Cir. 2003). The Forest Service's interpretation of the forest plan allowing for adjustments based

13  on monitoring was neither plainly erroneous nor inconsistent with NFMA, so the Forest Service

14  is accorded substantial deference. *Id*. at 1099 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S.

15  504, 512 (1994)). The Ninth Circuit concluded that allocating the available forage to livestock

16  and monitoring the use of the land was consistent with the Forest Plan. *Forest Guardians*, 329

17  F.3d at 1100. The Ninth Circuit also found that the reduction of grazing was consistent with the

18  requirements in NFMA and the Multiple-Use Sustained-Yield Act. *Id*. at 1097.

19       Plaintiffs aim to dismiss the discretion that the Forest Service has to implement the

20  multiple-use objectives, but that is not possible. *See id*. (finding that "the [Forest] Service is

21  entitled to substantial deference to its interpretation of its own regulations"). Plaintiffs'

22  arguments ignore the discretion given to the Forest Service to make adjustments to the grazing

23  permits due to its annual assessment of changed pasture conditions, new scientific information,

24  new rules, and past compliance by the permit holder. *Or. Nat. Desert Ass'n*, 465 F.3d at 985. The

25  Forest Plan and the Territory Management Plan operate as the objectives for management of the

26  Forest to guide the annual operating instructions. *Id*. at 984 (finding the Forest Service directly

27  "put[s] the [allotment management] decision into effect by issuing [the annual operating

28  instructions]") (citation omitted). "Because an [annual operating instruction] is issued annually,

28

it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the [allotment management plans] or grazing permit." *Id*. at 980-81.

Essentially, Plaintiffs disagree with the Forest Service's decisions as to range management. When faced with a similar situation in *Perkins v. Bergland* where appellants disagreed with the Secretary of Agriculture, the Ninth Circuit found that "courts are not at liberty to break the tie by choosing one theory of range management as superior to another." 608 F.2d at 806-07. Pursuant to *SUWA*, Plaintiffs' attempt to enforce the failure to implement the Territory Management Plan as a violation of NFMA is not cognizable under the APA. Even if this Court should compel the agency to act, there is no unreasonable delay as discussed above in response to the Wild Horse Act claim. Therefore, the Court should dismiss Plaintiffs' NFMA claims.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

Dated:        April 18, 2018                    Respectfully Submitted,


                                                JEFFREY H. WOOD,
                                                Acting Assistant Attorney General
                                                SETH M. BARSKY, Section Chief
                                                S. JAY GOVINDAN,
                                                Assistant Section Chief
                                                DAVENÉ D. WALKER,
                                                Trial Attorney


                                                /s/ Rickey D. Turner, Jr.
                                                RICKEY D. TURNER, JR.
                                                Trial Attorney
                                                U.S. Department of Justice
                                                Environment & Natural Resources Division
                                                Wildlife & Marine Resources Section
                                                999 18th Street
                                                South Terrace, Suite 370
                                                Denver, CO 80202
                                                Telephone: (303) 844-1373

                                                *Attorneys for Defendants*