JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

RICKEY D. TURNER, JR.
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Telephone:  (303) 844-1373
Facsimile:  (303) 844-1350

DAVENÉ D. WALKER
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:  (202) 353-9213
Facsimile:  (202) 305-0506

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| DEVILS GARDEN PRESERVATION GROUP, *et al.*, | Case No.: 2:17-cv-02185-MCE-KJN |
| Plaintiffs, | |
| vs. | **DECLARATION OF THOMAS WALTER FROLLI** |
| AMANDA McADAMS, *et al.*, | |
| Defendants. | |

1

DECLARATION OF THOMAS WALTER FROLLI

I, Thomas Walter Frolli, do declare as follows:

1. I have personal knowledge of the matters set forth herein and if called to testify I could and would testify competently thereto.

2. I have over 37 years of experience in range management as a rangeland specialist with the United States Forest Service ("Forest Service") primarily in the States of California (17 years) and Nevada (10 years). I had other seasonal range technician work with the Forest Service and/or the Bureau of Land Management ("BLM") in Wyoming (6 years), Montana, Idaho, and Colorado (4 years).  I hold a Bachelor of Science degree in range management from Humboldt State University.  I am a certified professional rangeland manager with both the State of California, Board of Forestry and Fire Protection (No. M77), and Society for Range Management (No. CP01-215). My career has included 13 years of experience in managing Wild Horse & Burro ("WH&B") populations and territories at the ranger district, forest, regional, and inter-regional levels.

3. Since July, 2015, I have served as the Regional Range Program Manager for the Pacific Southwest Region 5 (Region 5) of the Forest Service located in the State of California.  My responsibilities include management of the WH&B within Region 5.  The Region 5 WH&B Program includes management of eight active WH&B territories (territories) on five national forests. Five of the eight territories are associated with or in close proximity to BLM WH&B herd management areas. As Regional Range and WH&B Program Manager, my duties include providing guidance to ten range specialists with collateral WH&B duties at five Forest Supervisor Offices and six Ranger District offices throughout the state. In particular, I advise the offices on the WH&B program, Forest Service and BLM WH&B policies, budget administration, training, and inter-agency coordination (with local, State and Federal agencies).

4. Prior to this current position, I was the Forest Service Inter-Regional WH&B Program Coordinator for fifteen National Forests in seven Western States from February 2011 to July 2015. My coordinator position included liaison work between five Regional Offices and corresponding BLM State Offices on a total of 34 active WH&B territories in seven western

2

states for an estimated population of over 6,490 WH&B on National Forest System lands as reported in 2014 (source: https://www.fs.fed.us/wild-horse-burro/documents/territories/USFSWildHorseBurroTerritories2014.pdf).  The national forests with WH&B territories are in Montana (Region 1), New Mexico and Arizona (Region 3), Nevada and Utah (Region 4), California (Region 5) and Oregon (Region 6).  Twenty-three of the 34 active territories are also part of larger Joint Management Areas with BLM herd management areas. Joint Management Areas are BLM herd management areas/USFS territory complexes in which the wild horses or wild burros roam back and forth across administrative boundaries.

5.   I have conducted WH&B population surveys and health assessments, rangeland and riparian assessments, and ecological assessments on National Forest System rangelands and riparian areas across the states of Nevada and California.  I have done environmental planning under the National Environmental Policy Act; coordinated with BLM, other state agencies, and tribes; scheduled wild horse gathers with BLM at the national level; and requisitioned WH&B and tribal gather contracts.

6.   The Forest Service has a total of 53 designated WH&B territories.  Of those 53 territories, 34 are active and 19 are inactive.  Twenty-three of the 34 active territories are also Joint Management Areas. The day-to-day administration of the Forest Service's 34 active territories) resides at the Range District Offices, with oversight by the Forest Supervisor Offices, and policy and program guidance oversight by the five Regional Offices. Each of the 23 Joint Management Areas has corresponding administration by BLM public lands at the Field Office, oversight at the District Office, and policy and program guidance at the State Office. Each Forest Service territory and is managed based upon land use planning objectives and territory management plan objectives that have been implemented within each Forest Supervisor's Office.  Joint Management Areas must also be managed based on corresponding BLM land use planning from the District Office.  Lead agency agreements or Memorandums of Understanding are prepared for some but not all Joint Management Areas.  The most

3

DECLARATION OF THOMAS WALTER FROLLI

1    recent national Memorandum of Understanding for managing Joint Management Areas was

2    signed in 2017. AR2950; AR5947.

3                    **STATUTORY AND REGULATORY BACKGROUND**

4    7.   The Wild and Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act"), as

5         amended by the Federal Land Policy and Management Act of 1976 and the Public

6         Rangelands Improvement Act of 1978, establishes wild free-roaming horses and burros as a

7         part of the natural system where they occur on National Forest System lands.  Similar

8         protections were established on federal public lands administered by the BLM.  Only the

9         Forest Service and BLM have authorities under the Wild Horse Act.  The statutes outlined

10        above require management, protection, and control of these horses and burros.  Other statutes

11        that are important in the protection and control of wild free-roaming horses and burros are

12        the Multiple Use-Sustained Yield Act of 1960, the National Environmental Policy Act of

13        1969, and the Resource Planning Act as amended by the National Forest Management Act.

14   8.   Like BLM, the Forest Service's multi-use management of National Forest System lands

15        under the Federal Land Policy and Management Act must also take into account

16        responsibilities under statutes like the Wild Horse Act. Congress intended the Wild Horse

17        Act to address concerns that wild horses were vanishing from the West, and to preserve them

18        as "living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. But

19        within a few years after the Act's enactment, the situation had reversed itself "and action

20        [was] needed to prevent a successful program from exceeding its goals and causing animal

21        habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982)

22        (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)). As a result, Congress later

23        amended the Wild Horse Act to provide both agencies with greater authority and discretion

24        to carry out the Wild Horse Act's statutory mandate. *Id*.

25   9.   With respect to Federal public lands, Section 3 of the Wild Horses Act grants the Forest

26        Service authority over wild horses on National Forest System lands and BLM authority over

27        wild horses on public Federal lands under its jurisdiction and directs the agencies to protect

28        and manage these animals "as components of the public lands" and "in a manner that is

                                          4

1   designed to achieve and maintain a thriving natural ecological balance" on those lands. 16

2   U.S.C. § 1333(a); *see generally Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938 (10th Cir.

3   2016). The Forest Service implements the Wild Horse Act by establishing localized wild

4   horse or wild burro territories (territory).  The BLM does the same by establishing herd

5   management areas.  Generally, through land-use planning under the Federal Land Policy and

6   Management Act, each agency has set appropriate management levels for wild horse or burro

7   populations within each territory or herd management area.

8   10. In conjunction with a requirement that the two agencies maintain a current inventory of wild

9   horses, the Wild Horse Act authorizes both the Forest Service and BLM to use a variety of

10  methods to achieve appropriate management levels, including (but not limited to) the

11  removal and destruction of "excess animals." 16 U.S.C. § 1333(b)(1). As relevant, the Wild

12  Horse Act defines "excess animals" as those "wild free-roaming horses or burros . . . which

13  must be removed from an area in order to preserve and maintain a thriving natural ecological

14  balance and multiple-use relationship in that area." *Id*. § 1332(f).

15  11. Before the Forest Service or BLM may remove wild horses from a given territory or herd

16  management area, the Wild Horse Act requires the agencies to use current information to

17  make a two-part determination: first, "an overpopulation exists on a given area of the public

18  lands," *id*. § 1333(b)(1); and second, that instead of addressing overpopulation through

19  options "such as sterilization, or natural controls on population levels," *id*. § 1333(b)(1), "that

20  action is necessary to remove excess animals," *id*. § 1333(b)(1). Once the responsible

21  deciding officer makes these determinations, the Wild Horse Act provides that the agency

22  "shall immediately remove excess animals from the range so as to achieve appropriate

23  management levels." 16 U.S.C. § 1333(b)(2). The Wild Horse Act establishes an order of

24  priorities when removing excess horses but does not establish a specific statutory deadline

25  for the completion of any particular removal action. *Id*.

26  12. The term "sale without limitations" refers to Forest Service authorities under 16 U.S.C. §

27  1333(e) to sell excess animals or the remains of an excess animal if the excess animal is more

28  than 10 years of age or the excess animal has been offered unsuccessfully for adoption at

5

least 3 times. A common result of a "sale without limitations" is the eventual destruction or slaughter for commercial processing of the horse. The allowable method of sale is without limitation, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities, until such time as all excess animals offered for sale are sold; or the appropriate management level is attained in all areas occupied by wild free-roaming horses and burros.

13. Though BLM has the same authority under 16 U.S.C. § 1333(e), Congress has placed limitations on those authorities through various appropriation bills since 2005. *See, e.g.,* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399 (Dec. 16, 2014) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products."). Such "sales with limitation" imposed by Congress include:  a prohibition to destroy healthy unadoptable or unsold horses and a prohibition to kill healthy horses or burros for processing into commercial products.

## COOPERATIVE AGREEMENTS BETWEEN THE FOREST SERVICE AND BLM IN ACCORDANCE WITH THE WILD HORSE ACT

14. Since passage of the Wild Horse Act, the Forest Service and BLM have managed their respective programs under various National interagency agreements to provide coordination of Joint Management Areas, population inventories, data storage, unified adoption programs, joint reports to Congress, and establishment and appointment of a joint Wild Horse and Burro Advisory Board as authorized and directed by Congress (16 U.S.C. § 1337).

15. As noted in the current 2017 agreement, *see* AR5939, "The Bureau of Land Management (BLM) and the U.S. Forest Service have many similar objectives and requirements for managing wild horses and burros under their jurisdictions. Close cooperation in the Wild Horse and Burro Program (WH&B) has benefited both agencies. The purpose of this Service-wide Memorandum of Understanding is to set forth a framework for cooperatively managing wild horses and burros relative to ensuring their health and well-being. This collaboration is

6

intended to establish a focused, nationally coordinated, equitable interagency effort for the management of wild horses and burros that reside on both public lands managed by the BLM-and the National Forest System lands…The purpose of this [Memorandum of Understanding] is to document the cooperation between the parties to manage Joint Management Areas in accordance with the following provisions."  The agreement provides a framework for establishing lead agency and cooperative agency designations for preparing the appropriate analysis under the National Environmental Policy Act on Joint Management Areas. The agreement also provides a framework for establishing Service First agreements at the local level that provide for the sharing of personnel and equipment, and establish an equitable joint funding of surveys and population management operations.

16. Congress has long recognized these interagency agreements and authorized transfer of appropriated funds, particularly for operational support from BLM to the Forest Service. Also Congressional direction on disposition of funds generated by the Forest Service, from the sale of excess animals, requires that the funds be used as an offset collection for the BLM's adoption program [16 U.S.C. § 1333 (3)(A)(B)].  As recently stated in the Consolidated Appropriations Act of 2018 (P.L. 115-141), "Funds appropriated to the Forest Service shall be available for expenditure or transfer to the Department of the Interior, Bureau of Land Management, for removal, preparation, and adoption of excess wild horses and burros from National Forest System lands". In addition, Congress has continued to authorize and fund BLM contracts and agreements for WH&B long-term holding facilities (P.L. 115-141, Sec. 109)."  Congress authorizes transfer of funds from Forest Service to BLM knowing/understanding that these funds are also for the Forest Service's use of BLM's long-term holding facilities; Forest Service does not have these Congressional provisions or funding earmarks.

**DISCUSSION OF FOREST SERVICE RELIANCE ON BLM FOR OPERATIONAL MANAGEMENT OF WH&B HERDS**

17. Since passage of the Wild Horse Act in 1971, the Forest Service has focused its personnel and resources primarily on inventories, surveys and environmental analyses, forest planning,

7

and territory management plan development.  The Forest Service has generally relied on the BLM expertise or private contracted services for operational management of individual WH&B herds, including: gathers, removals, transport, holding facilities, animal care, adoption and sale events.  Congress has authorized Forest Service to transfer appropriated funds to BLM in support of these operational services.

18. The BLM WH&B program is over 10 times the size of the Forest Service WH&B program. BLM manages 177 herd management areas and 349 herd areas for a total of 526 wild horse and burro populations as compared to Forest Service's 53 territories.  In 2017 BLM estimates there are 72,674 WH&B on range, as compared to an estimated 6,500 on National Forest System lands.  BLM's appropriated budget for WH&B in 2017 was more than $80.5 million as compared to the Forest Service's approximately $2.8 million for WH&B in 2017.  BLM is the recognized lead federal authority on managing WH&B populations. BLM's WH&B program includes a large workforce of expert WH&B specialists, U.S. Department of Interior research and development capabilities, and an established infrastructure (e.g., off-range holding facilities) across the United States.  Therefore the Forest Service relies heavily on BLM for gathers, adoptions, off-range holding facilities because BLM has more expertise and experience because it's been dealing with wild horse issues longer and at a much larger scale.

19. As described in the national agreement between Forest Service and BLM, when the Forest Service authorizes and transfers custodial care of any individual or group of excess WH&B to BLM, it is with the understanding that those animals will be managed in accordance with BLM's authorities, regulations and policies.  Therefore, any limitations or prohibitions placed on BLM by Congress apply to Forest Service WH&B in BLM care.  Such Congressional prohibitions currently include: sales without limitation, and destroying healthy unadoptable or unsold horses or burros. Because of the Forest Service's heavy dependence and reliance on BLM expertise and off-range holding facilities, the vast majority of removed excess horses from Forest Service territories end up in BLM custody and care.

**FUNDING AND BUDGETARY CHALLENGES**

8

20. Fiscal planning for the Forest Service is a multi-year effort to identify appropriated National Forest System funds and needs for the WH&B Program in association with other rangeland resources. The WH&B Program is actually a sub-program or subpart to a much larger integrated resources program and budget referred to as the Vegetation and Watershed Restoration Program. As described in U.S. Department of Agriculture Forest Service *Fiscal Year 2018 Budget Justification*, May 2018 (https://www.fs.fed.us/about-agency/budget-performance), the Vegetation and Watershed Management program is a cornerstone of forest and rangeland restoration and enhancement activities on National Forest System lands. Watershed Management sub-programs improve forest and rangeland health by restoring watershed conditions, such as reduced soil erosion. Vegetation Management sub-programs emphasize landscape-scale restoration, as well as, focused, site-specific actions as needed. Management of WH&B populations is included in the rangelands resources section of Vegetation Management. Rangeland improvements include management and control of WH&B populations. In addition, appropriated Administrative Provisions funds to the Forest Service are identified and transferred to BLM. As directed by Congress, appropriated funds "…shall be available for expenditure or transfer to the Department of the Interior, Bureau of Land Management, for removal, preparation, and adoption of excess wild horses and burros from National Forest System lands, and for the performance of cadastral surveys to designate the boundaries of such lands."

21. The Fiscal Year ("FY") 2018 President's Budget proposed $174,400,000 for the Vegetation and Watershed Management program, a net decrease of $9,965,000 from the FY 2017. The FY 2018 budget request identified agency priorities as timber stand improvement projects and critical post-wildfire restoration work that reduces hazardous fuels and the potential for severe flooding and erosion on National Forest System lands.

22. Past and projected program expenditures of funds managed at the Forest Service National Headquarters are specifically tied to the Interagency Service First Agreement with BLM for long-term care and adoption. The program expenses/budget at the Washington Office for the WH&B Program has been driven by costs for the BLM's care of Forest Service animals in

9

long-term holding.  Transferred Administrative Provisions funds have varied from approximately $824,000 to $1.75 million over the last 8 years (Exhibit A of Frolli Declaration).  The Forest Service generally sets aside approximately $1.2 million annually.  However, BLM has not requested reimbursement of expenditures in some years.  Beginning in FY 2014 (October 1, 2014) the Forest Service and BLM mutually agreed to discontinue delivery of additional Forest Service horses or burros into BLM's off-range long-term holding facilities to curtail program costs for both agencies. The BLM has also taken other actions to control rising costs associated with increased WH&B numbers in off-range facilities. These BLM actions have included (1) moving animals from corral facilities to pasture facilities to reduce daily feed rates; (2) advertisement and marketing efforts to increase adoption and sale placements, and (3) zero net population gain of animals in off-range facilities where the number of animals removed from the range and delivered to off-range facilities approximately equal the death loss of animals in off-range facilities from natural causes. As Forest Service reimbursements to BLM have decreased, the Forest Service has applied those unused funds as supplemental funding to the regions for needed work at the forest on territories (Exhibit A to Frolli Declaration). The BLM has expressed a need for the Forest Service support shared pro-rated costs of future WH&B gathers on Joint Management Areas.  The BLM has also shown willingness to allow transfer of additional Forest Service horses or burros, on a case by case basis, if fiscal reimbursements from the Forest Service are equitable to the BLM over the life of each animals (individual animals are given a BLM/USFS tracking number for life during off-range care).

23. The Forest Service's nationwide WH&B program budget is approximately $2.2–$2.8 million dollars each year. This amount includes the transfer of funds to BLM for off-range facilities, allocation of funds to regional programs and funding of the WO WH&B Program Manager position. Forest Service does not track wild horse and burro program expenditures system-wide.  Therefore, any cost estimates specific to the WH&B Program, beyond the BLM Service First Agreement, are approximations.  Historically, the Forest Service has funded the WH&B program at 5% of the amount allocated to the National Forest System Grazing

DECLARATION OF THOMAS WALTER FROLLI

Management Program and 1.5% of the overall National Forest System Vegetation & Watershed Management Program.  Funding levels are based on partial funding of 28 full time equivalent rangeland management personnel with collateral duties managing the WH&B program at the field level. In FY 2017, Range Grazing Management was funded at $56,748,000; Vegetation & Watershed Management was funded at $184,365,000.  Allocating 1.5% of the Vegetation & Watershed Management, the WH&B program would have been funded at approximately $2.77 million. Due to limited funding in the WH&B program nationwide, the supplemental funding of individual WH&B projects or management activities are negotiated between the Washington Office Director of Range Management and those Regional Foresters with WH&B programs.  The Washington Office must make annual projections of costs for holding excess animals in off-range facilities and associated fund transfer obligations to BLM to cover those costs before any new projects can be approved for supplemental funding for on-range management at the regional level. On-range management activities include: resource/territory assessment, inventory, monitoring, and planning; population surveys and inventories; removal of excess animals; and range improvement projects. Off-range activities include transport to off-range facilities, care and feeding of excess wild horses and burros in holding facilities, preparation and gentling for adoption and/or sale, and adopter compliance.

24. U.S. Department of Agriculture Forest Service budget requests and justifications to Congress are the product of a careful priority-setting process based on, among other things, historical funding levels and other WH&B related funding commitments made by national leadership in the other regions other than Pacific Southwest Region 5 (California). Agency funding requests are impacted by numerous factors, and Forest Service's budget request cannot simply be raised unilaterally.

25. For example, in FY 2016 the Forest Service's highest priorities were to enhance water resources, respond to the effects of drought, and reduce the threat of catastrophic wildfire. . Wild fire preparedness and suppression alone accounted for more than 56% of appropriated discretionary funds that year (source: U.S. Department of Agriculture Forest Service *Fiscal*

11

*Year 2017 Budget Overview,* February 2016 https://www.fs.fed.us/about-agency/budget-performance). Forest Service has set a strategic objective to reduce wildfire risk on the highest priority National Forest System lands by five percent by 2020.  In the President's FY 2018 Budget Proposal, the Department of Agriculture made a primary request to Congress that Forest Service's Wildfire Suppression account be fully funded at the 10-year cost average, currently calculated at $1.057 billion.  Other less urgent programs to the agency and public have had to be funded at static or lowered funding levels.  In FY 2017, Forest Service funding to the WH&B Program was approximately one-half of one percent (0.056%) of the agency's FY 2017 appropriation ($4.89 billion).  Recommendations from the National WH&B Advisory Board that Forest Service use a specific budget line-item account for the WH&B program, similar to BLM, have been declined because it would be counter to agency's integrated budget approach for an individual program with relatively small funding levels.  Forest Service does not believe the level of funding to the WH&B program would warrant a separate budget line item with its subsequent accounting needs (AR 3153).

26. On the Modoc National Forest, the Vegetation & Watershed Management program was funded at $652,000 in FY 2017.  The proportional share of Vegetation & Watershed Management to the WH&B program assuming a rate of 1.5% would have been $9,780. Since 2012 the Washington and Regional offices have provided supplemental funding of $914,649 to manage the Devil's Garden wild horse population which averages $152,441 per year over 6 years.  Total supplemental annual funding to the Modoc, for managing the Devil's Garden territory has been approximately $162,221 since 2012. This annual appropriation is for all on-range management activities, salaries, overhead costs; also inter-agency agreement reimbursements to BLM Northern California District for a WH&B gather in 2016.  Reimbursement costs to BLM amounted to $684,532 by March 2018 resulting off-range activities to adopt out those excess animals (care and feeding of excess wild horses and burros in holding, preparation and gentling, adoption and/or sale, and adopter compliance). The costs relating to off-range holding facilities ($516,023) accounted for a majority (74%)

12

of the total funds which were made available for the FY2016 gather per BLM inter-agency agreement (Exhibit B to Frolli Declaration)

### WH&B PROGRAM CONSTRAINTS AND OTHER CHALLENGES

27. As noted above, the Forest Service has relied on BLM for operational management of WH&B populations on National Forest System lands by way of interagency agreements since creation of the Wild Horse Act in 1971.  Therefore, many of the constraints faced by BLM in managing WH&B on BLM public lands become the same constraints when managing WH&B on National Forest System lands, whether as part of a Joint Management Area or stand-alone Forest Service territory.

28. Holding capacity and budgetary limitations reduce Forest Service's and BLM's removal capabilities. The BLM often does not have sufficient corral or pasture space to hold the number of excess animals that exist, nor does it have sufficient funding. The Forest Service only has one small, 200 head capacity off-range holding corral which is located in Bloomfield, New Mexico. Because there are so few contractors available with the experience necessary to ensure that wild horse gathers on public lands are conducted in a safe and humane manner, each BLM State Office or Forest Service Region with identified and preapproved gather/removal needs must compete for limited holding space and available funding, as well as for the contractor's schedule. As a result, removals are prioritized based on court orders, public health and safety, current drought conditions, animal and habitat condition, and number of animals over the appropriate management level. Though Forest Service gathers are placed on this national gather schedule, BLM must consider its highest priority gather needs before making room and accommodation for additional Forest Service horses particularly if excess animals are not from a Joint Management Area.

29. Once a BLM State Office (and the associated Forest Service region) has been allocated a specific removal target, BLM State Office coordinates with the Washington Office to identify the holding facility(s) to which removed horses will be transferred. In addition, BLM does not conduct any helicopter gathers from March 1 through June 30 (absent emergency situations), which represents six weeks before and six weeks after peak foaling to minimize

13

the impacts of a gather on young foals. The Forest Service's Washington Office WH&B Program Manager and BLM Liaison is tasked with making gather recommendations for the entire Forest Service program based on the management needs across the five Forest Service Regions, and for allocation of resources among all those Regions and their National Forests from the national program.

30. Prioritizing one BLM State or Forest Service Region (or even one BLM District or National Forest) over another can cause ripple effects across each agency's National WH&B program, and directly impacts the ability of the BLM or Forest Service to operationally manage other herd management areas or territories in other western states for a thriving natural ecological balance.

31. Given the extensive advance planning necessary to conduct a safe and humane gather operation, it can take up to two years before Forest Service can issue a decision authorizing a gather operation. This planning involves drafting an Environmental Assessment, as required by the National Environmental Policy Act (NEPA), which analyzes the potential impacts of the proposed management operation(s). Often it is also necessary to update the appropriate management level(s) or supplement an existing analysis record with new or changed information. The entirety of this planning process necessitates coordination with federal, state and local agencies, public lands users and interested members of the public through review and comment on the proposed actions.

32. The Forest Service and BLM have usually used differing approaches for NEPA planning of WH&B territories and herd management areas. BLM has historically written gather plans specifically for removals that covered a given period of time and that addressed excess determinations of wild horses for a specific herd management area. These BLM gathers would be conducted soon after a decision record was signed and the specified appeal periods had passed.  These BLM decisions were generally considered valid for approximately five years. If additional gathers were required soon after or following this period of time, additional NEPA analysis was completed, along with the completion of a new BLM decision record. If conditions had changed, a new Environmental Assessment would be completed.

14

33. Beginning in 2012 BLM began producing gather plan Environmental Assessments that focused in on a phased-in gather approach.  This was achieved by proposing multiple gathers within an environmental assessment that was valid for a 6 to 10-year period. A BLM phased-in gather approach is comparable to the Forest Service's Territory Management Plan approach where multiple gathers are conducted over a period time, as funding constraints allow, with additional future gathers for maintenance.

34. Other constraints on the Forest Service include (among others):

a. Very limited funding and resources as compared to the need to gather, hold, and place excess wild horses.  The Forest Service would need to reconfigure or adjust appropriated discretionary funds within National Forest System appropriated funds and inform Congress.  In 2016, wild fire preparedness and suppression accounted for more than 56% of appropriated discretionary funds (source: U.S. Department of Agriculture Forest Service *Fiscal Year 2017 Budget Overview,* February 2016 https://www.fs.fed.us/about-agency/budget-performance). During fire season, unobligated discretionary funds are often used to offset fire suppression costs.  The need to re-direct funding towards high priority fire suppression may continue into the foreseeable future.

b. A substantial amount of the Forest Service's yearly budget is dedicated to housing excess horses already removed from the range.  It cost approximately $1,000 per animal per year for off-range holding.  In 2017 Forest Service reimbursed BLM $824,000 for horses and burros in off range holding facilities (Exhibit A to Frolli Declaration). This amounted to 69% of the total $1,200,000 WH&B program budget.  The Forest Service will have continued dependence on BLM off-range holding facilities unless or until it establishes its own off-range infrastructure network.

c. Though the Forest Service has sale authority without limitations, when custodial care of gathered horses is delegated or transferred to BLM, those individual animals must be managed under BLM regulations and policies.  BLM has sale authorities with limitations from Congress.  Twenty-three of the 34 active Forest Service territories are

DECLARATION OF THOMAS WALTER FROLLI

also Joint Management Areas shared by BLM and BLM is the lead agency on most of those 23 Joint Management Areas.  Usually horses or burros removed from those Joint Management Areas are taken into BLM custody.

d.  BLM's off-range corrals and pastures throughout the country have reached their capacities, exceeding 46,000 animals in 2017.  In recent years BLM only takes in as many horses or burros that leave the off-range holding facilities system annually due to adoption, sale, or natural death.  In 2017, BLM removed 3,735 horses and 474 burros for a total of 4,209 animals from public lands.  That same year BLM placed 3,423 horses and 676 burros for a total of 4,099 animals in private care (source: https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data ).  Due to these increasing demands, BLM has had to solicit additional off-range facilities.  The procurement process is long and drawn out.  Also, separate efforts to solicit off-range facilities by the Forest Service would compete against existing BLM efforts.

e.  There is low market demand for horse sales, particularly when conditions or limitations are placed on a sale.  There is very low demand for adoptions and per unit cost of placing horses by way of adoptions has become nearly cost prohibitive. Though the Wild Horse Act authorized the Forest Service to destroy old or unadoptable horses, taking such a measure on any meaningful scale would be extremely controversial and likely provoke national protest and condemnation from the public

f.  Apart from major funding and excess horse placement or disposal constraints, other complicating factors involved appeals and litigation.  The Territory Management Plan does contain a project implementation schedule (AR 1117-18).  However, there were no gathers planned or initiated following the September 2013 Decision Notice, which was appealed and administratively reviewed before a lawsuit was filed challenging the plan.  In that case, the plaintiffs sought to set aside the agency's decision and to enjoin the Modoc National Forest from taking any actions to implement the Territory Management Plan and/or adjust the territory boundary back to its original 1971

16

Declaration of Thomas Walter Frolli

configuration.  The Forest Service litigated those issues from March 2014 to September

2017 (*American Wild Horse Preservation Campaign v. Vilsack*, No. 1:14-cv-00485).

### DEVIL'S GARDEN WILD HORSE TERRITORY "EXCESS" DETERMINATION, SEPTEMBER 2013

35. Regulation 36 C.F.R. § 222.61 direct the Forest Service to analyze each WH&B territory and, based on that analysis, develop and implement a territory management plan.  Regulation 36 C.F.R. § 222.69(a) also authorizes the Forest Service to determine when an over-population of wild horses exists and removal is required.  Regulation 36 C.F.R. § 222.61(a) provides the steps required to make an "excess" determination: (4) analyze each wild horse or burro territory and, based on the analysis, develop and implement a management plan, which analysis and plans will be updated, whenever needed, as determined by conditions on each territory; and (5) maintain a current inventory of wild free-roaming horses and burros on each territory to determine whether and where excess animals exists; then (6) based on paragraphs (a) (4) and (5) of this section, determine appropriate management levels, whether action should be taken to remove excess animals and what actions are appropriate to achieve the removal or destruction of excess animals.

36. The Modoc National Forest followed the necessary steps outlined in 36 C.F.R. § 222.61(a) when it prepared the 2013 Environmental Assessment and developed the 2013 Devil's Garden Territory Management Plan based on that environmental assessment.  The 2013 Decision Notice and subsequent Territory Management Plan updated a needed change to the appropriate management level which had been established in the 1991 Modoc Forest Plan. The Territory Management Plan provided additional criteria for making the statutory "excess" finding, as follows: 1) when total population exceeds appropriate management level, or 2) when animals are found to be permanently residing outside the territory core area, or 3) when animal health/condition is at risk (AR 1114).

37. Forest Service manual direction defines a territory management plan as an operational plan (FSM 2260 definitions). As stated in the Devil's Garden Territory Management Plan, (AR 1102) it serves to document management goals, objectives, actions, and monitoring

17

requirements. The Territory Management Plan is meant to guide management of the territory for the next 15-20 years (AR 1102). It is also meant to be a living document whereby the Territory Management Plan is amended or revised approximately every 10 to 20 years as needed to reflect changed conditions after supplemental NEPA analysis (AR 1130, 1102). The Devil's Garden Territory Management Plan provided desired condition attainment dates; satisfactory rangeland conditions within 7 to 12 years (AR1105). The Territory Management Plan also anticipated attainment of the appropriate management level by 2016 if gathers were initiated in 2013 (AR1117). The 2013 Decision Notice and territory management plan made the excess determination with guidance to implement a phased gather schedule over the course of 4 to 5 years starting in 2013; and thereafter for 15-20 years. The excess/gather decision was to be updated and/or revised about every five years following monitoring of population numbers and distribution, herd health, and rangeland/habitat conditions (AR 1115-1117).

**FOREST SERVICE EFFORTS SINCE 2013 TO ADDRESS EXCESS HORSES**

38. The Forest Service has re-assigned funding within National Forest System appropriated funds and supplemented the Modoc National Forest's budget by $916,649. As Washington Office obligations to the BLM inter-agency agreement decrease over time additional funds will be made available to the Modoc.  Additional funds are tentatively available in FY 2018.

39. The Forest Service has retained the services of a professional facilitator under contract to facilitate the startup and partnership of one or more Devil's Garden wild horse territory collaborative groups (AR6903).  One such collaborative group is the Devil's Garden Adoption and Placement Committee; whose mission is to find new ways to place excess horses removed from the territory into private care.

40. The Modoc National Forest has made partnerships with Modoc County Farm Bureau, Pitt River Tribe, Bureau of Indian Affair, and local/national horse advocates to establish a local Modoc Mustang Training Program and increase the marketability and placement of excess Devil's Garden Plateau horses by adoption and/or sale to willing care takers and owners.

18

Case 2:17-cv-02185-MCE-KJN   Document 51-2   Filed 04/18/18   Page 19 of 35

41. The Forest Service is currently conducting an analysis under the National Environmental Policy Act for a modest off-range holding facility on the Modoc NF. Once this facility is completed the Forest Service will have the ability to conduct local preparation, gentling, adoptions, and sales which will reduce the dependency on BLM off-range holding facilities. Additionally, this Forest Service owned holding facility would provide the option for the Forest Service to use its full authorities under the Wild Horse Act,16 U.S.C. § 1333(e), to sell excess animals without limitations, or destroy excess horses if necessary.

42. The Forest Service and BLM continue to improve on the use of inter-agency agreements at the local level between the Modoc National Forest and the BLM Northern California District for use of Litchfield corrals and other off-range holding facilities, as well as support and training from BLM WH&B specialists.

43. The Forest Service Regional Office has submitted to the Washington Office a request for supplemental funding of one or more gathers in fall of 2018 and/or in 2019 to remove a portion of excess horses on Devil's Garden Territory. Modoc National Forest has initiated planning and preparation for the gather(s) and requisition of a gather contractor in the event this funding request is approved by the Washington Office. Preparation work entails development of local agreements and/or contracts to secure a temporary short-term holding facility for 100-200 horses. In addition, the 2013 Environmental Assessment record will be reviewed and supplemented, as needed, prior to any on-the-ground gather activities. The specified gather area would take into account the 2017 Circuit Court order regarding the designated territory boundary. Also, specific adjustments or clarifications would be made to the 2013 excess wild horse determination, as needed for management of individual animals and bands within the overall wild horse population.

    I declare under penalty of perjury that the foregoing is true and correct. Signed this 18th day of April, 2018 in Vallejo, California.

Thomas Walter Frolli

19

DECLARATION OF THOMAS WALTER FROLLI

## Exhibit A to Frolli Declaration

**Funding in Support of Forest Service Wild Horse and Burro Management**

**Wild Horse and Burro Allocations and Payments to Bureau of Land Management and National Forest Regions**

(These are supplemental funds, and do not include distributed funds in NFVW/NFRR)

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| **BLM WHB Agreement No.** | 214 | 214 | 214 | 305 | 305 | 305 | 305 | 305 |
| Allocation Received | $1,750,000 | $1,750,000 | $0 | $0 | $1,520,000 | $1,520,000 | $1,200,000 | $824,000 |
| BLM Agreement | $1,750,000 | $0 | $0 | $1,386,048 | $1,178,397 | $1,064,758 | $824,000 | $254,168 |
| BLM Costs (est FY2018) | | | | | | $1,110,288 | $509,038 | $551,313 |
| BLM Payments | $0 | $0 | $1,750,000 | $0 | $1,386,048 | $1,455,049 | $1,092,106 | $526,855 |
| **Support to Regions** | | | | | | | | |
| Region 1 | | | | | | | | |
| Region 3 | | | | | | $151,242 | $195,000 | $83,709 |
| Region 4 | | | | | | | $65,000 | $174,709 |
| Region 5 | | | | | | $304,000 | $180,000 | $204,886 |
| Region 6 | $250,000 | | | | | | | $121,477 |
| **TEAMS Management Pln** | | | | | | | | |
| R4 Hickison | | | $238,440 | | | | | |
| R3 Heber | | | $867,500 | | | | | |
| R6 Murderers Creek | | | $465,187 | $50,000 | | | | |
| **R6 End of FY2017 Funds** | | | | | | | $50,000 | |
| **USGS Surveys Funded*** | | | | $37,966 | $87,000 | $846 | | $297,145 |
| **UNR Research Funded** | | | | | $96,060 | | | |
| **Udall Foundation**** | | $470,000 | | | | | | |
| | | | | | | | | |

*Aerial surveys: 2014 for R3 and R4; 2015 for R4 and R5.

**Agreement Statements of Work finalized in FY2018: approximately 2/3 to R3, 1/3 to R4

5 April 2018, Prepared by Hope Woodward, National Wild Horse and Burro Program Manager

## Exhibit B to Frolli Declaration

Expenditures for various Modoc NF cost reimbursement Agreements with partners in support of managing the Devil's Garden Wild Horse Territory.  These expenditures do not include all the Forest Service personnel salaries or related costs in support of management activities.

| Agreement Name | Agreement Number | Total $ Allocated | Partner |
|---|---|---|---|
| Devil's Garden Wild Horse Territory Plan | 12CS11050900022 | $203,000.00 | Modoc County Farm Bureau |
| Wild Horse Management Territory Cooperation and Lead Agency Designation | 13MU11050900009 | $0.00 | BLM |
| Wild Horse Capture Support | 07CO11050950012 | $1,000.00 | Modoc County Farm Bureau |
| Wild Horse Helicopter Survey | 13IA11050900003 | $26,117.00 | BLM |
| Wild Horse Gather | Top of Form 16IA11050900013 Bottom of Form | $684,532.00 | BLM |
| Modoc Mustang Training Program | Top of Form 17IA11050900004 Bottom of Form | $64,000.00 | USDI, Bureau of Indian Affairs |
| Devil's Garden Wild Horse Management | Top of Form 17CS11050900009 Bottom of Form | $140,000.00 | Modoc County Farm Bureau |
| | Total | $914,649.00 | |

Prepared by Justin Gibson, Acting Forest Range Program Manager, Modoc NF, April 4, 2018.

Exhibit B to Frolli Declaration

Prepared by Emily Ryan, Associate Field Manager, Eagle Lake Field Office and Doug Satica, Litchfield
Corral Manager, BLM NorCal District, February 28, 2018

## BLM IAA #16IA11050900013 Reimbursement Log

| September 2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| Sept. 27 | 29 | | 29 | | | 29 | $139.20 | |
| Sept. 28 | 71 | | 99 | | 1 | 99 | $475.20 | |
| Sept. 29 | 32 | | 131 | | | 131 | $628.80 | |
| Sept. 30 | 35 | | 166 | | | 166 | $796.80 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **425** | **$2,040.00** | |
| **Total Adoptions** | | | | **0** | | | | **$0.00** |
| **September Total** | | **$2,040.00** | | | | | | |

| October 2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| Oct. 1 | | 1 | 166 | | | 166 | $796.80 | |
| Oct. 2 | 54 | | 220 | | | 220 | $1,056.00 | |
| Oct. 3-23 | | 21 | 220 | | | 4620 | $22,176.00 | |
| Oct 24-31 | | 8 | 219 | | 1 | 1752 | $8,409.60 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **6758** | **$32,438.40** | |
| **Total Adoptions** | | | | **0** | | | | **$0.00** |
| **October Total** | | **$32,438.40** | | | | | | |

Exhibit B to Frolli Declaration

| November 2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| Nov. 1-27 | | 27 | 219 | | | 5913 | $28,382.40 | |
| Nov. 28 | | 1 | 218 | 1 | | 218 | $1,046.40 | |
| Nov. 29-30 | | 2 | 216 | 1 | 1 | 432 | $2,073.60 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **6563** | **$31,502.40** | |
| **Total Adoptions** | | | | **2** | | | | **$1,800.00** |
| **November Total** | | **$33,302.40** | | | | | | |

| December 2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| Dec. 1-3 | | 3 | 216 | | | 648 | $3,110.40 | |
| Dec. 4-11 | | 8 | 214 | 2 | | 1712 | $8,217.60 | |
| Dec. 12-31 | | 20 | 213 | 1 | | 4260 | $20,448.00 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **6620** | **$31,776.00** | |
| **Total Adoptions** | | | | **3** | | | | **$2,700.00** |
| **December Total** | | **$34,476.00** | | | | | | |

Exhibit B to Frolli Declaration

| January 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | $2,100/ Adoption |
| Jan 1-31 | | 31 | 213 | | | 6603 | $31,694.40 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **6603** | **$31,694.40** | |
| **Total Adoptions** | | | | **0** | | | | **$0.00** |
| **January Total** | | **$31,694.40** | | | | | | |

| February 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| Feb 1-7 | | 7 | 212 | 1 | | 1484 | $7,123.20 | |
| Feb 8-28 | | 21 | 211 | | | 4431 | $21,268.80 | |
| | | | | | | | | |
| **Total Feed Days** | | | | | | **5915** | **$28,392.00** | |
| **Total Adoptions** | | | | **1** | | | | **$900.00** |
| **February Total** | | **$29,292.00** | | | | | | |

Exhibit B to Frolli Declaration

| March 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoption | Deaths | Feed Days | $4.80/head/day | |
| March 1-2 | | 2 | 211 | | | 422 | $2,025.60 | |
| March 3-8 | | 6 | 210 | 1 | | 1260 | $6,048.00 | |
| March 9-19 | | 11 | 208 | 2 | | 2288 | $10,982.40 | |
| March 20-22 | | 3 | 205 | | | 615 | $2,952.00 | |
| March 23-30 | | 8 | 204 | 1 | | 1632 | $7,833.60 | |
| March 31 | | 1 | 201 | | | 201 | $964.80 | |
| **Total Feed Days** | | | | | | **4585** | **$30,806.40** | |
| **Total Adoptions** | | | | **4** | | | | **$3,600.00** |
| **March Total** | | | | | **$34,406.40** | | | |

| April 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| April 1-2 | | 2 | 201 | | | | 402 | $1,929.60 |
| April 3 | | 1 | 198 | | | | 198 | $950.40 |
| April 4-11 | | 8 | 196 | | | | 1568 | $7,526.40 |
| April 12- 16 | | 5 | 195 | 1 | | | 975 | $4,680.00 |
| April 17-18 | | 1 | 196 | 1 | | | 196 | $940.80 |
| April 17-30 | | 14 | 194 | 2 | | | 2716 | $13,036.80 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | | |
| **Total Feed Days** | | | | | | | **3339** | **$29,064.00** |
| **Total Adoptions** | | | | **4** | | | | **$3,600.00** |
| **April Total** | | | | | **$32,664.00** | | | |

Exhibit B to Frolli Declaration

| May 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| May 1-5 | | 5 | 194 | | 4 | | 970 | $4,656.00 |
| May 6-8 | | 3 | 190 | | | | 570 | $2,736.00 |
| May 9-10 | | 2 | 189 | 1 | | | 378 | $1,814.40 |
| May 11 | | 1 | 188 | 1 | | | 188 | $902.40 |
| May 12-14 | | 3 | 185 | 1 | | | 555 | $2,664.00 |
| May 15-22 | | 8 | 182 | 1 | | | 1456 | $6,988.80 |
| May 23-30 | | 8 | 181 | 1 | | | 1448 | $6,950.40 |
| May 31 | | 1 | 180 | | | | 180 | $864.00 |
| **Totals** | | | | **5** | **4** | | **2106** | **$27,576.00** |
| **Total Adoptions** | | | | **$4,500.00** | **$8,400.00** | | | **$12,900.00** |
| **May Total** | | | **$40,476.00** | | | | | |

Exhibit B to Frolli Declaration

| June 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoptions | $2,100/ Adoption | Deaths | Feed Days | $4.80/head/day |
| June 1-3 | | 4 | 180 | 1 | | | 720 | $3,456.00 |
| June 4-5 | | 1 | 179 | | 1 | | 179 | $859.20 |
| June 6-9 | | 4 | 172 | | | | 688 | $3,302.40 |
| June 10 | | 1 | 171 | | 1 | | 171 | $820.80 |
| June 11 | | 1 | 169 | | | | 169 | $811.20 |
| June 12-13 | | 2 | 168 | | 1 | | 336 | $1,612.80 |
| June 14 | | 1 | 153 | 1 | | | 153 | $734.40 |
| June 15-21 | | 6 | 151 | 4 | | 1 | 906 | $4,348.80 |
| June 22-25 | | 4 | 149 | | | | 596 | $2,860.80 |
| June 26-27 | | 2 | 148 | 1 | | | 296 | $1,420.80 |
| June 28 | | 1 | 143 | | 2 | | 143 | $686.40 |
| June 29 | | 1 | 142 | | | | 142 | $681.60 |
| June 30 | | 1 | 140 | 1 | | | 140 | $672.00 |
| Totals | | | | 8 | 5 | | 2416 | $22,267.20 |
| Total Adoptions | | | | $7,200.00 | $10,500.00 | | | $17,700.00 |
| June Total | | $39,967.20 | | | | | | |

Exhibit B to Frolli Declaration

| July 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| July1-5 | | 5 | 140 | 1 | | | 700 | $3,360.00 |
| July 6-13 | | 8 | 138 | 2 | | | 1104 | $5,299.20 |
| July 14-20 | | 7 | 137 | 3 | | | 959 | $4,603.20 |
| July 21-27 | | 7 | 137 | 1 | | | 959 | $4,603.20 |
| July 28-31 | | 5 | 127 | 2 | | | 635 | $3,048.00 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 9 | 0 | | 4357 | $20,913.60 |
| Total Adoptions | | | | $8,100.00 | $0.00 | | | $8,100.00 |
| July Total | | $29,013.60 | | | | | | |

Exhibit B to Frolli Declaration

| August  2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Weaned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| August 1 |  | 1 | 127 | 1 | 1 |  | 127 | $609.60 |
| August 2-6 |  | 5 | 126 | 0 |  |  | 630 | $3,024.00 |
| August 7-10 |  | 4 | 125 | 4 |  | 1 | 500 | $2,400.00 |
| August 11-13 |  | 3 | 121 | 7 |  |  | 363 | $1,742.40 |
| August 14-17 | 33 | 4 | 153 | 2 | 6 | 1 | 612 | $2,937.60 |
| August 18-24 |  | 7 | 152 | 1 | 2 | 1 | 1064 | $5,107.20 |
| August 25 |  | 1 | 151 | 1 |  |  | 151 | $724.80 |
| August 26-27 |  | 2 | 149 |  | 2 |  | 298 | $1,430.40 |
| August 28-31 |  | 4 | 150 | 3 |  |  | 600 | $2,880.00 |
| Totals |  |  |  | 19 | 11 |  | 1620 | $20,856.00 |
| Total Adoptions |  |  | $17,100.00 | $23,100.00 |  |  |  | $40,200.00 |
| August Total |  | $61,056.00 | | | | | | |

Exhibit B to Frolli Declaration

| September 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | weaned | Days | Animals | $900/ Adoptions | $2,100 /Adoption | Deaths | Feed Days | $4.80/head/day |
| Sept. 1-3 | | 3 | 145 | 3 | | | 435 | $2,088.00 |
| Sept. 4 | | 1 | 144 | | | 1 | 144 | $691.20 |
| Sept. 5-6 | | 2 | 142 | 4 | | | 284 | $1,363.20 |
| Sept. 7-8 | | 2 | 140 | 2 | | | 280 | $1,344.00 |
| Sept. 9-11 | | 3 | 139 | | | 1 | 417 | $2,001.60 |
| Sept. 12 | | 1 | 138 | 1 | | | 138 | $662.40 |
| Sept. 13 | | 1 | 137 | 2 | | | 137 | $657.60 |
| Sept. 14 | | 1 | 128 | 8 | 3 | | 128 | $614.40 |
| Sept. 15 | | 1 | 125 | 2 | | | 125 | $600.00 |
| Sept. 16-17 | | 2 | 118 | 7 | | | 236 | $1,132.80 |
| Sept. 18 | 17 | 1 | 135 | 1 | 2 | 1 | 135 | $648.00 |
| Sept. 19 | | 1 | 129 | | | | 129 | $619.20 |
| Sept. 20-23 | | 4 | 92 | | | | 368 | $1,766.40 |
| Sept. 24-28 | 1 | 5 | 93 | 1 | 1 | | 465 | $2,232.00 |
| Sept. 29-30 | | 2 | 91 | 1 | | | 182 | $873.60 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 32 | 6 | | 1560 | $17,294.40 |
| Total Adoptions | | | | $28,800.00 | $12,600.00 | | | $41,400.00 |
| September Total | | $58,694.40 | | | | | | |

Exhibit B to Frolli Declaration

| | Weaned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
|---|---|---|---|---|---|---|---|---|
| October  2017 | | | | | | | | |
| October 1 | | 1 | 91 | | | | 91 | $436.80 |
| October 2 | | 1 | 92 | | | | 92 | $441.60 |
| October 3 | | 1 | 40 | | | | 40 | $192.00 |
| October 4 | | 1 | 38 | 1 | | 2 | 38 | $182.40 |
| October 5 | | 1 | 34 | | | 4 | 34 | $163.20 |
| October 6 | | 1 | 30 | | | 4 | 30 | $144.00 |
| October 7 | | 1 | 23 | | | 7 | 23 | $110.40 |
| October 8-9 | | 2 | 20 | | | 3 | 40 | $192.00 |
| October 10-31 | | 22 | 14 | 5 | | 6 | 308 | $1,478.40 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 6 | 0 | | 261 | $3,340.80 |
| Total Adoptions | | | | $5,400.00 | $0.00 | | | $5,400.00 |
| October Total | | | | $8,740.80 | | | | |

Exhibit B to Frolli Declaration

| November  2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Weaned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| Nov. 1-2 | | 2 | 14 | 2 | | | 28 | $134.40 |
| Nov. 3-5 | | 3 | 15 | | | | 45 | $216.00 |
| Nov. 6 | | 1 | 16 | | | | 16 | $76.80 |
| Nov. 7-8 | | 2 | 9 | 15 | | | 18 | $86.40 |
| Nov. 9-14 | | 6 | 7 | 5 | | | 42 | $201.60 |
| Nov. 15-16 | | 2 | 6 | 1 | | | 12 | $57.60 |
| Nov. 17-20 | | 4 | 5 | 2 | | | 20 | $96.00 |
| Nov.21-29 | | 9 | 4 | | | | 36 | $172.80 |
| Nov. 30 | | 1 | 3 | 1 | | | 3 | $14.40 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 26 | 0 | | 107 | $1,056.00 |
| Total Adoptions | | | | $23,400.00 | $0.00 | | | $23,400.00 |
| November Total | | $24,456.00 | | | | | | |

Exhibit B to Frolli Declaration

| December  2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Returned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| Dec. 1-10 | | 10 | 3 | | | | 30 | $144.00 |
| Dec. 11-12 | | 2 | 1 | 3 | | | 2 | $9.60 |
| Dec. 13-14 | 1 | 2 | 2 | | | | 4 | $19.20 |
| Dec. 15-31 | 1 | 17 | 3 | | | | 51 | $244.80 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 3 | 0 | | 87 | $417.60 |
| Total Adoptions | | | | $2,700.00 | $0.00 | | | $2,700.00 |
| Dec Total | | $3,117.60 | | | | | | |

| January 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Returned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| Jan 1-17 | | 17 | 3 | | | | 51 | $244.80 |
| Jan 18-31 | | 14 | 2 | 1 | | | 28 | $134.40 |
| | | | | | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 1 | 0 | | 79 | $379.20 |
| Total Adoptions | | | | $900.00 | $0.00 | | | $900.00 |
| Jan Total | | $1,279.20 | | | | | | |

Exhibit B to Frolli Declaration

| February 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Returned | Days | Animals | $900/ Adoptions | $2,100/ Adoptions | Deaths | Feed Days | $4.80/head/day |
| Feb 1- | | | | 1 | | | 0 | $0.00 |
| | | | | | | | 0 | $0.00 |
| Totals | | | | 1 | 0 | | 0 | $0.00 |
| Total Adoptions | | | | $900.00 | $0.00 | | | $900.00 |
| Feb Total | | $900.00 | | | | | | |

| | |
|---|---|
| GATHER OPERATIONS | $181,380.98 |

| | |
|---|---|
| 2016 TOTAL HOLDING & ADOPTIONS | $102,256.80 |

| | |
|---|---|
| 2017 TOTAL HOLDING & ADOPTIONS | $392,678.40 |

| | |
|---|---|
| 2018 TOTAL HOLDING & ADOPTIONS | $2,179.20 |

| | |
|---|---|
| PZP TOTAL (62 MARES X $305)* | $18,910.00 |

| | |
|---|---|
| IAA BEGINNING BALANCE (W/ $50K ADD) | $684,532.00 |

| | |
|---|---|
| IAA REMAINING BALANCE | -$10,694.18 |

* This is the total # of initial treatments, we administered 35 boosters in addition to this

Exhibit B to Frolli Declaration